2003 SD 105

Arnold WULF, individually and as representative of the Estate of Landon Paul Wulf, Plaintiff and Appellant,

v.

Jeff SENST; Mervin Bultje; Kirk Preheim and Preheim Lawn & Landscape, Inc., as successor of Preheim Lawn & Landscape, Defendants and Appellees,

and

Jeff Senst and Mervin Bultje, Defendants, Third Party Plaintiffs and Appellees,

v.

Myra Wulf, Third Party Defendant and Appellant.

Catherine Westphal and Joanna Westphal, Plaintiffs and Appellees,

v.

Myra Wulf, Defendant and Appellant,

and

Farmers Insurance Exchange, Defendant,

v.

Jeff Senst; Mervin Bultje; Kirk Preheim; and Preheim Lawn and Landscape, Inc., as successor of Preheim Lawn and Landscape, Third Party Defendants and Appellees.

Nos. 22428, 22429.

Supreme Court of South Dakota.

Argued Feb. 11, 2003.

Decided Aug. 27, 2003.

Michael J. Schaffer of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, Attorneys for appellants Arnold Wulf and Myra Wulf.

Roger A. Sudbeck of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, South Dakota, Attorneys for appellees Jeff Senst and Mervin Bultje.

Mark V. Meierhenry of Danforth, Meierhenry & Meierhenry, Sioux Falls, South Dakota, Attorneys for appellees Kirk Preheim & Preheim Lawn & Landscape, Inc.

Todd C. Miller, and Steven M. Johnson of Johnson, Heidepriem, Miner, Marlow & Janklow, Sioux Falls, South Dakota, Attorneys for appellees Catherine Westphal and Joanna Westphal.

RUSCH, Circuit Judge.

[¶ 1.] These appeals involve two related cases. Both cases arose from an automobile accident on January 21, 2000, involving cars driven by Myra Wulf and Catherine Westphal. The trial court granted summary judgment in favor of Jeff Senst and Mervin Bultje, employees of the South Dakota Department of Transportation (DOT), on the grounds of sovereign immunity and denied a motion to consolidate the two cases for trial. We reverse.

## FACTS

[¶ 2.] Both of these cases resulted from a tragic automobile accident that occurred on Highway 42 between Sioux Falls and Brandon at approximately 7:30 a.m. on January 21, 2000. Myra Wulf and her son, Landon, were traveling east on Highway 42 as she was taking him to school. Catherine Westphal and her daughter, Joanna, were traveling west on Highway 42 as she was going to work. A car, which has never been located or identified, fishtailed

in front of Wulf, causing her to brake and lose control of her vehicle. As a result, Wulf's car crossed the center line and collided with Westphal's vehicle. Westphal and her daughter were injured, Wulf was seriously injured, and her son was killed.

[¶ 3.] Highway 42 between Sioux Falls and Brandon is part of the state highway system, so the State of South Dakota is responsible for clearing snow and ice from the highway. Historically this portion of Highway 42 has been a difficult road to maintain because of hills, numerous curves, high banks, trees, and shady areas.

[¶ 4.] The State of South Dakota has delegated responsibility for maintenance of its roads and highways to DOT. SDCL 31–4–14. DOT contracted with Kirk Preheim and Preheim Lawn and Landscape, Inc., to provide winter road maintenance over this portion of Highway 42. Melvin Bultje is the Sioux Falls Area DOT maintenance supervisor. He is responsible for supervising and directing the work activities of highway maintenance crews over 300 miles of roads in the Sioux Falls area. Jeff Senst is DOT Sioux Falls area engineer and Bultje's immediate supervisor. Senst reports to Tom Weeks, the DOT regional engineer.[1] Both Bultje and Senst were responsible for insuring that Highway 42 between Sioux Falls and Brandon was safe for travel. However, Senst relied on Bultje to make the specific decisions on snow and ice removal.

[¶ 5.] On January 19, 2000, a winter storm hit the Sioux Falls/Brandon area. The storm began in the early morning hours with rain that changed to snow as the temperature dropped nearly 30 degrees within four hours. Because of the heavy snow the entire Sioux Falls area DOT maintenance crew was called in to work between 4:00 and 4:30 that morning.

The morning traffic on January 19 packed down the snow on all of the area highways. The snow and rain froze hard to the road surface so additional contractors were called out with scrapers.

[¶ 6.] Both DOT and private trucks and scrapers worked throughout January 19 and into the night of January 19/20, clearing and sanding the roads. Throughout this time Preheim's two trucks worked on Highway 42 as well as the other roads for which he was responsible. The next day, January 20, temperatures were near zero. Because of the temperature and road conditions, the sand/salt mixtures and truck scrapers used by the maintenance crews had limited effect. Preheim estimated that on January 20 his crew made at least twenty round trips plowing and sanding this area of Highway 42. During this two-day period Preheim and Bultje discussed whether calcium or magnesium flakes would melt the ice and snow on the road but determined that they would probably not be effective under the existing weather conditions. They also discussed whether a road grader would break up the snow pack and ice on the road. Preheim brought out a road grader to see if it would be effective and made four passes over this stretch of Highway 42 on January 20. In addition to the grading, a truck followed and plowed and sanded the road.

[¶ 7.] At approximately 8:00 p.m. on January 20, Preheim and Bultje decided to stop sanding and deicing efforts on Highway 42 and start again at 8:00 a.m. on January 21. Bultje claims that the highway was "all sanded out" so he authorized the maintenance crews, including Preheim's, to quit and not to return to work until 8:00 a.m. the following morning. When Preheim quit work at 8:00 p.m. on

---

1. In their brief, appellees identify Senst as the regional engineer. However Tom Weeks is the regional engineer and Senst is the area engineer.

January 20, he claims he and one of his employees drove home over Highway 42 and it was in good condition. He also claimed at that time the road was so thoroughly sanded that it "looked black." Preheim has also testified he drove over this road at 6:00 a.m. the following morning on the way to work, and Highway 42 was well sanded and in good condition.

[¶ 8.] In response to the motion for summary judgment, Wulfs provided affidavits from three witnesses who were familiar with Highway 42 and who had traveled over it on January 20 and 21. Two of those witnesses were volunteer firemen and emergency medical technicians who responded to the Wulf/Westphal accident. These witnesses disputed the claims that the road was well sanded and in good condition.

[¶ 9.] Mark Kuca indicated by affidavit that Highway 42 was in such bad condition on the afternoon of January 20 that he personally called Senst telling him that DOT needed to maintain the road or "someone was going to die." He also claims that when he arrived at the Wulf/Westphal accident on the morning of January 21, the road was icy and slippery, that it was difficult to do anything because of the slippery conditions, that there was no sand or salt on the roadway, that there were two inches of ice on the roadway, and that the road did not appear to him to

have been sanded the night before the accident.

[¶ 10.] Tim Nicolai, who lives within several miles of the accident scene, indicated that he traveled past the location of the accident about twenty minutes before it occurred. According to his affidavit, the road did not appear to have been sanded or salted, either the night before the accident or on the morning of the accident, and that his vehicle slid as he went up a hill so that he had to put it in 4 wheel drive. He also claimed that when he arrived at the accident scene, his fire truck slid on the ice, that it was so slippery at the scene that the firemen had to walk by shuffling their feet to avoid falling down, and that the area where the accident occurred had not been sanded.

[¶ 11.] A third witness, Warren McLain, indicated that he was on Highway 42 between 7:30 p.m. and 9:30 p.m. on January 20 and that the road was snow-packed and icy and that no sand had been applied to the road. He further indicated that his vehicle wheels spun due to the ice.

[¶ 12.] SDCL 31–5–8.3 requires DOT establish a winter safe highway maintenance plan for snow removal, sanding and deicing in order to provide safe highways during cold weather months. In response to this requirement DOT has established various winter road maintenance policies, including Policy 2531 which deals with sanding.[2] It is this DOT policy which es-

---

2. Policy 2531 provides:
   *DESCRIPTION:*
   Applying sand or a sand chemical mixture to snow packed or icy roadway surfaces.
   *PURPOSE:*
   To reduce slippery conditions, as soon as possible.
   *QUALITY AND WORKMANSHIP:*
   1. The sanding operations shall be performed in the following sequence:
   FIRST—Utilize sufficient equipment to apply continuous coverage to the interstate and those highways shown on the current Priority One Route Map.
   SECOND—Utilize the remaining equipment to sand hills, curves, highway intersections and dangerous locations on all other routes.
   THIRD—Available equipment may be used to apply continuous coverage to non-priority one routes.
   FOURTH—Service roads, local intersections and other areas may be sanded.

tablishes Senst and Bultje's responsibilities, not the contract between DOT and Preheim.

[¶ 13.] On the morning of January 21 sanding operations did not commence at 5:00 a.m. as required by Policy 2531. Bultje authorized the maintenance crews to wait until three hours later, 8:00 a.m., to start sanding. Unfortunately, the Wulf/Westphal accident occurred at 7:30 a.m., one-half hour prior to the scheduled 8:00 a.m. start time.

[¶ 14.] Two different lawsuits were filed as a result of the accident. In the first, Catherine Westphal and Joanna Westphal sued Myra Wulf, alleging that Wulf's negligence caused injury to Catherine Westphal and Joanna Westphal.[3] Wulf

> 2. The following table shall be used as a guide for material mixtures to use in sanding operations.
> Above 32 —Use sand or salt mixed stockpiled abrasive
> 20 –32 —Add 100–300# of salt or 1 bag of calcium chloride per 6 ton load
> 10 –20 —Add 1 to 3 bags of calcium chloride per 6 ton load
> Below 10 —Add 3 to 5 bags of calcium chloride per 6 ton load
> Mix salt into the abrasive material at a rate of approximately 250 lbs. per ton of material.
> Additional salt may be added to the abrasive material, up to a maximum of 1000 pounds per ton, to increase the mileage covered per load.
> 3. The application rate for all sanding operations shall be within a minimum rate of ½ ton per two-lane mile and a maximum rate of 1 ton per two-lane mile when a chemical has been mixed with the abrasive at normal rates.
> 4. When additional quantities of salt have been added, the application rate shall generally be adjusted to apply between 150 and 250 pounds of salt per two-lane mile, but may be increased when determined by the Maintenance Supervisor.
> 5. The kind of material mixture to be used shall be determined by the Maintenance Supervisor to handle present and/or expected conditions.
> 6. Application of abrasive mixture should be confined to the center 6 to 10 feet of two-lane roadway.
> 7. A card or sander chart (DOT–819) showing the truck speeds, sander gate openings and/or sander speeds needed to deliver specific rates of material shall be available to the operator.
> *SCHEDULING AND INSPECTION:*
> 1. Sanding is an emergency item that shall have priority over all other activities except those pertaining to snow and ice removal. Daily inspections and reports will determine the locations and amount of sanding necessary to satisfy route priorities.
> 2. Based on whether (sic) forecasts and existing weather conditions, the Maintenance Supervisor may start sanding operations just prior to or near the beginning of the storm in an effort to eliminate and/or minimize the formation of slippery conditions.
> 3. Changes in the sequence, rates or limits of work, as stated in this standard, may be permitted by the Region Engineer or his authorized representative.
> *PROCEDURE:*
> 1. Sanders shall be calibrated before they are placed into service and should then be checked annually for changes that could possible (sic) affect application rates.
> 2. Perform this work in accordance with the sequence rates listed in this standard.
> 3. Repeat applications as needed to meet existing conditions and provide traction.
> 4. During the period between 5:00 a.m. and 7:00 p.m., continue sanding operations until either the highways are in a condition such that traffic is moving safely or conditions become too hazardous for continued operation.
> Sanding operations between the hours of 7:00 p.m. and 5:00 a.m. will be at the discretion of the maintenance supervisor. When highway and traffic conditions warrant, progress can be made and staffing is available, sanding operations may be continued after 7:00 p.m.

3. Westphal also sued Farmers Insurance under the uninsured motorist provisions in the policy Farmers wrote on her vehicle. None of the issues herein relate to that claim.

then brought a third party action against Preheim, who was responsible for the maintenance of Highway 42, and against Senst and Bultje, the supervising DOT employees. In this third party action Wulf seeks indemnity and contribution from Preheim for negligent maintenance of the highway and from DOT employees, who she claims knew or should have known that Preheim was not properly maintaining the highway. Wulf also seeks damages for the injuries that she sustained as a result of this negligence.

[¶ 15.] In the second action, Arnold Wulf (Myra's husband), individually and as a representative of the estate of their son Landon, sued Preheim for negligent maintenance of Highway 42 and the DOT employees who were responsible for supervising that maintenance. He alleges Preheim negligently maintained the highway and DOT knew or should have known Preheim was not properly performing his maintenance obligation. He seeks damages for the wrongful death of Landon and the loss of consortium of his wife Myra. In this action DOT cross-claimed against Preheim for indemnity and contribution and also brought a third party action against Wulf claiming that it was her negligence that caused the accident and that she should be responsible for indemnification and contribution.

[¶ 16.] Senst and Bultje moved for summary judgment in both cases because of the doctrine of sovereign immunity. The trial court granted summary judgment in both cases, holding Senst's and Bultje's duties were discretionary in nature so that the doctrine of sovereign immunity shielded them from liability. Arnold Wulf also filed a motion to consolidate the two cases for trial. The trial court denied the motion to consolidate because the cases involved distinctly different parties, because of the potential for jury con-

fusion, and because of the possibility of prejudice.

## DECISION

### I. Summary Judgment

#### A. Standard of Review

[¶ 17.] Summary judgment is only appropriate when the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits of the parties, reveal that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. SDCL 15–6–56(c); *Breen v. Dakota Gear & Joint Co., Inc.*, 433 N.W.2d 221 (S.D. 1988). In addressing a motion for summary judgment: 1) the court must view the evidence most favorably to the non-moving party; 2) the burden of proof is on the moving party to show clearly that there are no genuine issues of material fact; 3) summary judgment is not a substitute for trial; 4) summary judgment is not appropriately granted just because the court believes the non-moving party will not prevail at trial; 5) summary judgment is an extreme remedy and should be awarded only on a clear showing of the necessary elements; and 6) where there are no genuine issues of material fact, summary judgment is looked upon with favor as particularly adaptable to expose sham claims and defenses. *Production Credit Ass'n v. Wynne*, 474 N.W.2d 735 (S.D.1991); *Klatt v. Continental Ins. Co.*, 409 N.W.2d 366 (S.D.1987); *Wilson v. Great Northern Railway Company*, 83 S.D. 207, 157 N.W.2d 19 (1968).

[¶ 18.] While the moving party has the burden of showing that there are no genuine issues of material fact, the non-moving party cannot merely rest on the pleading, but must present specific facts by way of "affidavits or as otherwise pro-

vided in SDCL 15–6–56 . . .", SDCL 15–6–56(e), setting forth specific facts showing the existence of genuine issues of material fact. *State Farm Mut. Auto. Ins. Co. v. Ragatz,* 1997 SD 123, 571 N.W.2d 155. Mere general allegations or denials will not prevent the issuance of summary judgment. *Werner v. Norwest Bank South Dakota,* 499 N.W.2d 138 (S.D.1993); *Weiszhaar Farms v. Live Stock State Bank,* 467 N.W.2d 752 (S.D.1991). The party opposing summary judgment must establish the specific facts which show that a genuine and material issue for trial exists. *Anderson v. Production Credit Ass'n,* 482 N.W.2d 642 (S.D.1992).

[¶ 19.] On appeal, we determine only whether a genuine issue of material fact exists and whether the law was applied correctly. If there is a basis which supports the ruling of the trial court, we affirm. *Casazza v. State,* 2000 SD 120, 616 N.W.2d 872. However, summary judgment will only be affirmed if there are no genuine issues of material fact and the legal questions have been decided correctly. *Bego v. Gordon,* 407 N.W.2d 801 (S.D. 1987). The issue of sovereign immunity is a question of law which is reviewed by the Supreme Court *de novo,* with no deference given to the trial court's legal conclusions. *Hansen v. South Dakota Dept. of Transp.,* 1998 SD 109, 584 N.W.2d 881.

### B. Sovereign Immunity.

[¶ 20.] The doctrine of sovereign immunity, as established in the common law and the South Dakota Constitution, prevents the governing acts of the state, its agencies, other public entities, and their employees from attack in court without the state's consent. *Casazza,* 2000 SD 120 at ¶ 11, 616 N.W.2d at 875. However, not all acts performed by state employees are governing acts. *Wilson v. Hogan,* 473 N.W.2d 492 (S.D.1991).

"Whether a state employee, who is sued in an individual capacity, is entitled to immunity depends upon 'the function performed by the employee.'" *Casazza,* 2000 SD at ¶ 11, 616 N.W.2d at 875. State employees are immune from suit when they perform discretionary functions, but not when they perform ministerial functions. *Kruger v. Wilson,* 325 N.W.2d 851 (S.D.1982). The distinction between the two was explained in *Kyllo v. Panzer,* 535 N.W.2d 896, 902 (S.D.1995):

> In *National Bank of South Dakota v. Leir,* 325 N.W.2d 845 (S.D.1982), this court explained the distinction between the two classifications in conjunction to liability. This court stated, "[immunity] extends to a governmental employee who, while acting within the scope of his employment, exercises a discretionary function." *Id.* at 848 (citations omitted). State employees are cloaked in sovereign immunity when performing discretionary acts because "such discretionary acts participate in the state's sovereign policy-making power." *Ritter v. Johnson,* 465 N.W.2d 196, 198 (S.D.1991). Factors to be considered in determining a discretionary function are:
>
> (1) The nature and importance of the function the officer is performing;
>
> (2) The extent to which passing judgment on the exercise of discretion by the officer will amount necessarily to passing judgment by the court on the conduct of a coordinate branch of government;
>
> (3) The extent to which the imposition of liability would impair the free exercise of his discretion by the officer;
>
> (4) The extent to which the ultimate financial responsibility will fall on the officer;
>
> (5) The likelihood that harm will result to members of the public if the action is taken;

(6) The nature and seriousness of the type of harm that may be produced;

(7) The availability to the injured party of other remedies and other forms of relief.

*Leir,* 325 N.W.2d at 848 (citing Restatement (Second) of Torts, § 895D, comment f (1979)). Furthermore, this court has consistently held sovereign immunity barred a cause of action against the state where the state was the real party in interest. *High–Grade Oil,* 295 N.W.2d 736; *Wisc. Granite Co. v. State,* 54 S.D. 482, 223 N.W. 600 (1929).

Nevertheless, *Leir* reaffirmed the co-existence of case precedent holding employees responsible for their negligence in performing ministerial tasks. It stated, "a state employee who 'fails to perform a merely ministerial duty, is liable for the proximate results of his failure to any person to whom he owes performance of such duty.'" *Leir,* 325 N.W.2d 845 (citing *Conway v. Humbert,* 82 S.D. 317, 145 N.W.2d 524 (1966); *Walters v. City of Carthage,* 36 S.D. 11, 153 N.W. 881 (1915); *Ruth,* 9 S.D. at 90, 68 N.W. at 190)). This court ultimately held employees liable for the consequences of their negligent acts. *Leir,* 325 N.W.2d at 848–49.

This court, in defining ministerial acts in *Ritter,* explained that "a ministerial act is the simple carrying out of a policy already established ... so that permitting state employees to be held liable for negligence in the performance of merely ministerial duties within the scope of their authority does not compromise the sovereignty of the state." *Ritter,* 465 N.W.2d at 198 (citations omitted).

[¶ 21.] The determination as to whether an act is discretionary or ministerial requires an individualized inquiry in each case:

[T]he determination as to whether an official has acted in his or her discretion or capacity, and therefore is entitled to immunity, is not subject to a fixed, invariable rule, but instead requires a discerning inquiry into whether the contributions of immunity to effective government in the particular context outweigh the perhaps recurring harm to individual citizens....

[T]he view has been expressed that, in the final analysis, the decision as to *whether a public official's acts are discretionary or ministerial must be determined by the facts of each particular case* after weighing such factors as the nature of the official's duties, the extent to which the acts involve policymaking or the exercise of professional expertise and judgment, and the likely consequences of withholding immunity.

*Hansen,* 1998 SD 109 at ¶ 23, 584 N.W.2d at 886 (quoting 63C Am.Jur.2d, *Public Officers and Employees* § 327, at 775–776 (1997)).

C. Highway Repair and Maintenance

[¶ 22.] This Court has considered whether highway repair and maintenance functions are discretionary or ministerial in nature on prior occasions. *See Arms v. Minnehaha County,* 69 S.D. 164, 7 N.W.2d 722 (1943) (governmental immunity applied to an accident involving a snow plow); *High–Grade Oil Co., Inc. v. Sommer,* 295 N.W.2d 736 (S.D.1980) (sovereign immunity applies to design of a highway); *Smith v. Greek,* 328 N.W.2d 261 (S.D.1982) (whether sovereign immunity applies to DOT engineers should have been determined based upon whether their function was ministerial or discretionary); *Bryant v. Butte County,* 457 N.W.2d 467 (S.D. 1990) (county's duty to adequately maintain county roads was ministerial not discretionary); *Wilson,* 473 N.W.2d 492 (state is immune from suit arising from the con-

struction and maintenance of highways); *Bland v. Davison County*, 507 N.W.2d 80 (S.D.1993) (*Bland I*) (county could be liable for allowing a dangerous condition arising from snow and ice, to continue for an unreasonable time); *Bland v. Davison County*, 1997 SD 92, 566 N.W.2d 452 (S.D. 1997) (*Bland II*) (it was a jury question as to whether it was reasonable for county to knowingly leave an icy patch of road unsanded); and *Hansen*, 1998 SD 109 at ¶ 23, 584 N.W.2d at 886 (the duties of the Secretary of the DOT who supervised hundreds of employees and thousands of miles of highways were discretionary because highway repair, while usually considered ministerial, could be discretionary under some circumstances).

■■ [¶ 23.] This Court held that the state is immune from suits arising from highway construction and maintenance unless it has waived sovereign immunity. *Wilson*, 473 N.W.2d at 495. However, this Court has also held that highway repair is generally considered to be ministerial in nature:

> The view has also been expressed that the distinction between discretionary and ministerial acts is often one of degree, since any official act that is ministerial will still require the actor to use some discretion in its performance. And, under particular circumstances, *even a task or function usually considered ministerial-for example . . . highway repair* may actually involve the exercise of discretion. (emphasis supplied).

*Hansen*, 1998 SD 109 at ¶ 23, 584 N.W.2d at 886 (quoting 63C Am.Jur.2d *Public Officers and Employees* § 327 at 775–776 (1997)).

[¶ 24.] We have not addressed the specific issue of whether snow and ice removal is a discretionary or ministerial function of government.[4] Other states have reached differing results on the issue of snow and ice removal. *Shepard v. State Dept. of Roads*, 214 Neb. 744, 336 N.W.2d 85 (1983) (it is the duty of the state to use reasonable and ordinary care in the construction, maintenance and repair of its highways, including snow removal, so that they are safe for travelers using them while exercising reasonable and ordinary care and prudence); *Hansen v. State*, 528 N.W.2d 547 (Iowa, 1995) (the state and municipalities are immune from tort liability for failure to remove snow and ice as long as they have complied with established policies); *Koen v. Tschida*, 493 N.W.2d 126 (Minn.App. 1992) (under Minnesota's weather immunity statute the government is immune from claims based on snow or ice conditions which were not affirmatively caused by the actions of the government); *In Re Alexandria Accident of Feb. 8, 1994*, 561 N.W.2d 543 (Minn.App.1997) (statutory immunity protects planning decisions which involve questions of public policy and receive protection as discretionary decisions, but does not protect operational decisions which relate to the day-to-day operation of government); *Lane v. State*, 811 A.2d 190 (Vt. 2002) (the decision as to whether to close a road due to inclement weather or erect warning signs is discretionary but the state does have a duty to act when it has actual or constructive warning of a defect and a reasonable amount of time to correct it). Many of these decisions, however, are based upon specific state statutes.

### D. Discussion

[¶ 25.] The claims against Senst and Bultje are based upon allegations that

---

**4.** The *Bland* decisions did not resolve the issue of whether sovereign immunity applied to snow removal because Davison County had liability insurance and, as a result, sovereign immunity was not applicable. *See Bland I*, 507 N.W.2d at 82 (Wuest, J., concurring specially).

Senst and Bultje knew or should have known that Highway 42 was dangerous and that Preheim was not properly performing his maintenance obligations and they took no action to correct that problem. The specific claim is that Senst and Bultje failed to supervise Preheim's work, failed to inspect Highway 42 on the morning of January 21, failed to ensure that Preheim used proper sand/salt/chemical mixtures, and failed to comply with Policy 2531 in regard to the times of sanding.

[¶ 26.] At issue is whether these alleged failures are ministerial or discretionary in nature.

[A] ministerial act is defined as *absolute, certain, and imperative*, involving merely the execution of a specific duty arising from fixed designated facts or the execution of a set task imposed by a law prescribing and defining the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion, being a simple, definite duty arising under and because of stated conditions and imposed by law. A ministerial act envisions direct adherence to a governing rule or standard with a compulsory result. It is performed in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action. In short, once it is determined that the act should be performed, subsequent duties may be considered ministerial. If there is a *readily ascertainable standard* by which the action of the government servant may be measured, whether that standard is written or the product of experience, it is not within the discretionary function exception.

*Hansen*, 1998 SD 109 at ¶ 23, 584 N.W.2d at 886 (quoting 57 Am.Jur.2d *Municipal, County, School & State Tort Liability* § 120, at 132–33 (1988)).

[¶ 27.] South Dakota is located in the northern great plains and there will be frequent occasions when the state is subjected to severe bad weather.

Decisions of how to allocate snow plow operators, resources and equipment, whether for open graded pavement or conventional pavement are clearly decisions that involve discretion and elements of choice. The Vermont Agency of Transportation (VAOT) must use discretion in deciding how many workers to call in for any given winter storm event, how many trucks to put on the road at any given time, where on highways to place those vehicles, and how much salt to use. Decisions of how to combat severe winter weather conditions clearly involve the balancing of policy considerations including safety, economic, social and environmental factors. *See Amelchenko v. Borough of Freehold.* (citation omitted). ("The decision adopting a procedure regulating when, where and in what order of priority the equipment and personnel are to be used in dealing with [snowstorms] is legislative or governmental in nature. Such decisions cannot be subject to review in tort suits for damages, for this would take the ultimate decision-making authority away from those who are responsible politically for making the decisions.")

*Lane*, 811 A.2d at 197–198.

[¶ 28.] Decisions made by DOT as to how to combat blizzards and other severe winter weather conditions involve the balancing of various policy considerations which are legislative or governmental in nature and not subject to review in tort suits. Decisions made by Senst and Bultje as to how to allocate snow plow operators, resources and equipment, how many workers to call in for any given winter storm event, how many trucks to put on the road at any given time and

where on the highways to place those vehicles are all discretionary and subject to sovereign immunity.

[¶ 29.] Senst's functions as area engineer for DOT are similar to those attributed to "Howard" in *Hansen, supra* at ¶ 29, 584 N.W.2d at 887–888:

> We fail to see how [SDCL 31–5–1] provides a *"readily ascertainable standard* by which the action of [Howard] may be measured...." (57 Am.Jur.2d *Municipal, County, School & State Tort Liability* § 120, at 133). When applied to a position that supervises hundreds of employees and thousands of miles of highways, it certainly calls for discretion, judgment or skill. One could not pluck an ordinary citizen off the street and expect they could successfully execute the duties of Howard's offices as required by this statute. (emphasis added).

[¶ 30.] Bultje's obligations as maintenance supervisor were similar. He was obligated to inspect the roads but he was also responsible for the maintenance of over 300 miles of roads. There were no clear standards as to when or how often Bultje was to inspect these roads and in particular Highway 42. This was discretionary on Bultje's part.

[¶ 31.] However, DOT Policy 2531 imposes a requirement to use specified sand/salt/chemical mixtures and to continue sanding operations from 5:00 a.m. (in the morning) until 7:00 p.m. (in the evening) unless 1) the traffic is moving safely or 2) conditions become too hazardous for continued operations.[5] The trial judge concluded that the decision to stop plowing and sanding due to its ineffectiveness was a judgment call on the part of Senst and Bultje. However the record, as developed on the motion for summary judgment, does not support the finding that the plowing and sanding were ineffective.[6] In resolving a motion for summary judgment, if there are disputed facts, the trial court must view the evidence most favorably to the non-moving party. In light of the affidavits of Kuca, McLain, and Nicolai, which must be accepted as true for purposes of this motion, the traffic was not moving safely. There is also nothing in the record that establishes that the conditions were too hazardous for continued operations.[7] There are also genuine issues of material fact as to whether the proper sand/salt/chemical mixtures were used.

[¶ 32.] Senst and Bultje were obligated to follow DOT Policy 2531 unless one of the exceptions was present. Once DOT made the decision to adopt policy 2531, Senst and Bultje were obligated to follow it. "[O]nce it is determined that the act should be performed, subsequent duties may be considered ministerial." *Hansen,* 1998 SD 109 at ¶ 23, 584 N.W.2d at 886 (quoting 57 Am.Jur.2d *Municipal, County, School & State Tort Liability* § 120 (1988)). DOT has adopted a policy requiring certain sand/salt/chemical mixtures and that sanding start at 5:00 a.m. In this case sanding was not commenced until 8:00 a.m., one-half hour after the deadly accident. There are genuine issues of material fact as to whether either of the excep-

---

5. Policy 2531 specifies that sanding between 7:00 p.m. (in the evening) 5:00 a.m. (in the morning) is discretionary. This indicates that sanding at other times is not discretionary unless it comes within one of the exceptions.

6. In fact, the trial court' memorandum opinion refers to claims that the roads were all sanded out and that there was still a really thick coat of sand. These claims are disputed.

7. Policy 2525 also provides criteria under which plowing operations can cease but the record on this motion does not establish that those criteria were met either.

tions within Policy 2531 were present on the morning of January 21, 2000.

In order to discharge his duties effectively, a public servant must be free to exercise his judgment unhampered by the fear of unpredictable liability. Where the nature of the servant's decision or action in question is such that it may not be measured against a predictable standard of care, the possibility of litigation may tend to discourage the making of clear choices. It is in the public interest to avoid such a chilling effect upon the servant's performance of his duties. Where, on the other hand, a standard of care may be defined and applied with relative ease, the public servant is not similarly deterred and the public interest in the protection of the official weakens.

*Hansen*, 1998 SD 109 at ¶ 31, 584 N.W.2d at 888 (quoting *DuBree v. Commonwealth*, 481 Pa. 540, 393 A.2d 293, 295 (1978)). While Senst and Bultje have discretion to determine such things as how many workers to call in for a storm, how many snowplows to put on the road, and where to place them, they do not have discretion to ignore the standards or policies established by DOT. Summary judgment was improperly granted on this issue.

## II. Consolidation.

### A. Standard of Review.

[¶ 33.] The consolidation of cases is authorized by SDCL 15–6–42(a) which provides:

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

[¶ 34.] The denial or grant of a motion to consolidate suits is reviewed under an abuse of discretion standard. *Martinmaas v. Engelmann*, 2000 SD 85, ¶ 35, 612 N.W.2d 600, 609.

### B. Discussion

[¶ 35.] There are two different lawsuits involved in this appeal. Both of them arise from the Wulf/Westphal accident of January 21, 2000. The first of them (*Catherine Westphal and Joanna Westphal v. Myra Wulf and Farmers Insurance Exchange, v. Jeff Senst, Mervin Bultje, Kirk Preheim and Preheim Lawn and Landscape, Inc.—Minnehaha County CIV 00–3643*) (which will be referred to as the Westphal lawsuit) raises the issues of: 1) whether Myra Wulf was negligent; 2) whether Myra Wulf's negligence was the proximate cause of the injuries sustained by Catherine and Joanna Westphal; 3) the nature and extent of the injuries sustained by Westphals; 4) whether Farmers Insurance is liable as a result of a mystery vehicle; 5) whether Senst, Bultje, and Preheim's negligence, either solely or in connection with the negligence of others, was the cause of the accident; 6) whether Senst, Bultje, and Preheim's negligence was the proximate cause of the injuries sustained by Myra Wulf; and 7) the nature and extent of the injuries suffered by Myra Wulf.

[¶ 36.] The other lawsuit (*Arnold Wulf v. Jeff Senst; Mervin Bultje; Kirk Preheim, and Preheim Lawn and Landscape, Inc. and Jeff Senst and Mervin Bultje v. Myra Wulf–Minnehaha County CIV 01–194*) (which will be referred to as the Wulf lawsuit) has the following issues: 1) whether Senst, Bultje, and Preheim were negligent; 2) whether Senst, Bultje and Preheim's negligence was the proximate cause of the death of Landon Wulf; 3) the nature

and extent of the injuries suffered by Arnold Wulf individually and as representative of Landon's estate; and 4) whether Myra Wulf's negligence, either solely or in connection with the negligence of others, was the cause of the accident.

[¶ 37.] Each case has unique issues. However, the pivotal issues as to whether Wulf was negligent and whether Senst, Bultje, and Preheim's negligence, either solely or in connection with the negligence of others, was the cause of the accident, are common to both lawsuits. Because of the third party claims the same issues of Senst, Bultje and Preheim's negligence will be present in both cases. The results of both lawsuits will depend upon a determination of whether the accident was Wulf's fault or whether it was the fault of Senst, Bultje and Preheim. There are some different parties to each lawsuit and there are different damage claims. However, most of the parties to both lawsuits are the same. Wulf, Senst, Bultje, Preheim and Preheim Lawn and Landscape are parties to both suits. The majority of the witnesses will be the same in both suits.

[¶ 38.] This Court must weigh the allegations of prejudice against judicial expedition and economy. Westphals' claim that they will be prejudiced by mention of Landon's death. However, this Court does not believe that the Westphal lawsuit can be tried without reference to his death or without some jurors who remember that tragedy. The "mere possibility of some prejudice does not justify separate trials where such prejudice is not substantial and there are strong countervailing considerations of economy." *Landstrom v. Shaver*, 1997 SD 25, ¶ 28, 561 N.W.2d 1, 6. "The reasons usually given as justification for consolidation of these actions are judicial economy, the risk of inconsistent results from two juries when

the transactions and operative facts are closely intertwined, and the undue delay and expense caused by separate trials." *Praus ex rel. Praus v. Mack*, 2001 ND 80, 626 N.W.2d 239, 246. In this case, essentially the same testimony about the accident will have to be given twice if there are two separate trials. Separate trials will not be conducive to expedition and economy. In addition, separate trials may lead to inconsistent results. The Westphal lawsuit could result in a verdict in favor of Wulf and against Senst, Bultje and Preheim while the Wulf lawsuit results in a verdict in favor of Senst, Bultje and Preheim and against Wulf.

[¶ 39.] The trial court's refusal to consolidate in this situation was an abuse of discretion. The summary judgments and order denying the motion to consolidate are reversed.

[¶ 40.] GILBERTSON, Chief Justice, and KONENKAMP and ZINTER, Justices, concur.

[¶ 41.] SABERS, Justice, concurs in part and dissents in part.

[¶ 42.] RUSCH, Circuit Judge, for MEIERHENRY, Justice, disqualified.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 43.] Senst and Bultje do not create government policy, as their duties merely required them to *implement* the Department's previously established policy. The distinction between creating and implementing government policy should not be ignored when determining whether sovereign immunity applies. *Creating* governmental policy requires discretion and is entitled to sovereign immunity protection. *Implementing* governmental policy is ministerial and is not entitled to sovereign immunity protection. Therefore, Senst

and Bultje should not be shielded from liability by sovereign immunity for their failure to inspect, maintain the roadway, plow and sand from 5–7 a.m., and require Preheim to maintain insurance.

[¶ 44.] This Court made the distinction between discretionary and ministerial acts clear in *Ritter,* where it stated:

> The reason state employees are shielded from lawsuits by the state's immunity when they perform discretionary acts within the scope of their authority is that such discretionary acts participate in the state's sovereign policy-making power. In contrast, a ministerial act is simply carrying out of a policy already established[.]

*Ritter v. Johnson,* 465 N.W.2d 196, 198 (S.D.1991) (additional and internal citations omitted). The majority opinion states at ¶ 28, "[d]ecisions made by Senst and Bultje as to how to allocate snow plow operators, resources and equipment, and how many workers to call in for any given winter storm event, how many trucks to put on the road at any given time, where on the highways to place those vehicles, and how much salt to use are all discretionary and subject to sovereign immunity." The majority opinion goes on to state at ¶ 30 that "[t]here were no clear standards as to when or how often Bultje was to inspect these roads and in particular Highway 42." A review of the record indicates that the Department has created specifications regarding these issues and all that remained was for Senst and Bultje to implement those policies.

[¶ 45.] The contract between Preheim and the DOT provided specific equipment requirements, clear direction on the priority and time spent plowing each road, priority of roads for application of sanding and mixture rates for sanding. The contract also contained the requirement that Preheim maintain insurance.

[¶ 46.] Performance Standard # 2524 provided specifications for snow and ice control, giving requirements as to the priority of roads to be plowed, how often the roads are to be inspected, and the type of plows to be used and how they are to be used when plowing. This standard also requires that plowing be continued between 5 and 7 a.m.

[¶ 47.] Policy # 2531 details specific performance standards for sanding and salting and provides a table to show the sand and salt mixture to be used depending upon the temperature.

[¶ 48.] Policy # 13 provides "specifications for abrasive material and gradation of salt."

[¶ 49.] Policy # 23 establishes the priority of routes for winter maintenance operations.

[¶ 50.] In a policy letter dated October 29, 1996, the Department provided guidelines for the reassignment of snow removal equipment during storms.

[¶ 51.] Policy # 2531 and # 13 allow the Region Engineer some discretion but this discretion was not extended to Bultje. More important, the duties neglected in this case remain predominantly ministerial. A ministerial act is always a ministerial act, even though it includes elements of discretion. For example, driving a car is a ministerial act, even though it involves discretion in choosing the lane, the route and the speed. Likewise, the Department has created policy regarding winter maintenance operations which leaves little room for discretion, particularly with regard to Bultje's duties.

[¶ 52.] The fatal defect in the majority opinion is demonstrated by the following example:

> Assume Bultje did absolutely nothing to inspect, absolutely nothing to plow snow

and absolutely nothing to maintain the roadway despite a severe snowstorm lasting days.

The majority opinion would conclude that Bultje was not subject to liability because those three duties were discretionary. In fact, under a proper ruling, the jury should determine in each instance whether Bultje's inaction constituted negligence, with liability for injuries and damages caused thereby.

[¶ 53.] Although Senst and Bultje had *some* discretion as to how and when to perform their duties, that discretion did not rise to the level of creating policy or shield them from liability for negligence, if proven. Their failure to inspect, plow snow, maintain the roadway, sand, start at 5 a.m. and to purchase insurance (or require the same of a sub-contractor) [8] are and remain ministerial acts.

---

**8.** The majority opinion is also fatally flawed in its statement that "[i]t is this DOT policy which establishes Senst and Bultje's responsibilities, not the contract between DOT and Preheim." Majority opinion, ¶ 12. The statement presumes that the contract does not represent DOT policy which Senst and Bultje were responsible for enforcing. However, the contract between Preheim and the DOT was drawn by the DOT and presumably represents DOT policy. Senst and Bultje are the parties charged with supervising Preheim and enforcing the contract. Their failure to do so is a failure to enforce DOT policy (a ministerial duty) and they should be liable for that failure. Furthermore, if Senst and Bultje fail to enforce the contract, who will? Under the majority opinion, nobody is liable when the DOT fails to ensure its contractors are fulfilling their contract requirements. Again, a proper ruling would allow the jury to determine whether this failure constituted negligence.