SABERS, Retired Justice
(dissenting).
[¶47.] I respectfully dissent. Griese argues and the trial court declared that summary judgment was appropriate because “the duty under [SDCL] 31-28-6 is a discretionary duty and therefore ... sovereign immunity applies.” I disagree. In fact, I believe that when certain factual circumstances exist,[19] the duty mandated by SDCL 31-28-6 is ministerial. Additionally, there are at least eight reasons why summary judgment should not have been granted by the trial court and affirmed by the majority of this Court in this case.

Sovereign Immunity & the PEPL Fund

[¶ 48.] “Sovereign immunity is the right of public entities to be free from liability for tort claims unless waived by legislative enactment.” Public Entity Pool for Liability v. Score, 2003 SD 17, ¶ 7 n. 3, 658 N.W.2d 64, 67 n. 3 (citing Alden v. Maine, 527 U.S. 706, 715, 119 S.Ct. 2240, 2247, 144 L.Ed.2d 636 (1999) (citations omitted)). Specifically, the South Dakota Constitution, Article III, section 27 proclaims: “The Legislature shall direct by law in what manner and in what courts suits may be brought against the state.” “Therefore, in the absence of legislative enactment the state is immune from liability in tort.” Bego v. Gordon, 407 N.W.2d 801, 804 (S.D.1987). To that end, our Legislature has defined the conditions for the waiver of sovereign immunity in SDCL 21-32A-1, which states:
To the extent that any public entity, other than the state, participates in a *89 risk sharing pool or purchases liability insurance and to the extent that coverage is afforded thereunder, the public entity shall be deemed to have waived the common law doctrine of sovereign immunity and shall be deemed to have consented to suit in the same manner that any other party may be sued....
(Emphasis added.)
[¶ 49.] SDCL ch. 3-22 sets forth the laws governing this state’s public entity pool for liability (PEPL) fund. The first section, in part, sets forth the fund’s coverage:
The purpose of this program is to provide a fund as the sole source for payment of valid tort claims against all member public entities of the state and their officers and employees for all liability they may incur based upon negligence in the operation of motor vehicles or negligence in performing other acts within an employee’s scope of employment. ...
SDCL 3-22-1 (emphasis added). The breadth of coverage is notable. However, the statute continues:
Excluded from coverage under this chapter are claims involving employee grievances and awards for back pay, workers’ compensation, employee health programs, single point-source pollution damage, asbestos related injuries, and claims arising from engineering and design of any public roadway in this state by any employee of any entity.
Id. Additionally, the PEPL Fund Memorandum (memo) includes nearly all the exclusions listed in the statute and significantly expands the list.[20] Remarkably, the *90 statute and the memo exclude very specific claims, including “claims arising from engineering and design of any public roadway[.]” However, neither the statute nor the memo excludes liability for the claim here: failure to erect and maintain substantial and conspicuous warning signs on roadways approaching sharp turns, blind crossings, or other points of danger. Instead, we are left with the following potentially applicable exclusion: “16. For damages that are a result of a discretionary act or task. This exclusion does not apply if the damages are the result of a ministerial act or task[.]” Therefore, when state employees are covered under the PEPL fund, sovereign immunity is waived, to the extent of coverage, for damages resulting from that employee’s failure to perform a ministerial duty, but it is not waived for liability resulting from failure to perform a discretionary duty.
[¶ 50.] If the Legislature wanted to provide immunity for failing to erect and maintain signage, it could have simply removed the act from the broad coverage of the statute. It chose not to do so. Instead, this Court is left to determine whether the act is discretionary or ministerial.

*91
Sovereign Immunity: Discretionary vs. Ministerial

[¶ 51.] A dichotomy exists: ministerial or mandatory acts are provided no immunity, while discretionary acts are immunized. The difficulty arises in distinguishing the discretionary acts from those that are ministerial. South Dakota case law has identified factors helpful in drawing this distinction. These factors include:
(1) The nature and importance of the function the officer is performing;
(2) The extent to which passing judgment on the exercise of discretion by the officer will amount necessarily to passing judgment by the court on the conduct of a coordinate branch of government;
(3) The extent to which the imposition of liability would impair the free exercise of his discretion by the officer;
(4) The extent to which the ultimate financial responsibility will fall on the officer;
(5) The likelihood that harm will result to members of the public if the action is taken;
(6) The nature and seriousness of the type of harm that may be produced;
(7) The availability to the injured party of other remedies and other forms of relief.
King v. Landguth, 2007 SD 2, ¶ 11, 726 N.W.2d 603, 607 (citations omitted). Upon applying these factors to this case, it is important to recognize that liability will not fall upon the officer exercising his duty, the likelihood of harm to the public is great, and the nature and seriousness of the harm is extremely grave. Moreover, passing judgment on the officer’s discretion will not be passing judgment upon a separate branch of government and there is no real availability of relief to the injured parties. Therefore, these factors favor the conclusion that the act at issue was ministerial, not discretionary.

Statutory Interpretation & Genuine Issues of Material Fact

[¶ 52.] Due to the language of SDCL 31-28-6, however, the ministerial/discretionary analysis is not even necessary. The statute provides:
The public board or officer whose duty it is to repair or maintain any public highway shall erect and maintain at points in conformity with standard uniform traffic control practices on each side of any sharp turn, blind crossing, or other point of danger on such highway ... a substantial and conspicuous warning sign, which sign shall be on the right-hand side of the highway approaching such point of danger. A violation of this section is a Class 1 misdemeanor.
SDCL 31-28-6 (emphasis added). This Court has previously recognized the distinction between creating governmental policy and merely implementing the same. See King, 2007 SD 2, ¶ 11, 726 N.W.2d at 607 (noting that sovereign immunity extends to employee’s discretionary acts because “ ‘such discretionary acts participate in the state’s sovereign policy-making power’ ” (quoting Kyllo v. Panzer, 535 N.W.2d 896, 902 (S.D.1995) (emphasis added))); Wulf v. Senst, 2003 SD 105, ¶20, 669 N.W.2d 135, 143 (“a ministerial act is the simple carrying out of a policy already established” (internal citations omitted)); Nat’l Bank of S.D. v. Leir, 325 N.W.2d 845, 850 (S.D.1982) (“Although some discretion in its literal sense is involved in foster care, social workers do not make policy decisions involving foster care placement. The criteria for placement ... [is] already established. Social workers are merely required to carry out or administer these previously established standards.”).
*92 [¶ 53.] Here, however, by using the word “shall,” the statute sets forth a mandatory duty: signs shall be erected when a sharp turn, blind crossing or other point of danger exists. “Shall” is a mandatory directive. Fritz v. Howard Twp., 1997 SD 122, ¶ 15, 570 N.W.2d 240, 242 (“When ‘shall’ is the operative verb in a statute, it is given ‘obligatory or mandatory’ meaning.”). In a recent opinion authored by Chief Justice Gilbertson, this Court unanimously declared that the word “shall” directs mandatory action, leaving no room for discretion. We stated, “The statutory definition of ‘shall’ ... ‘manifests a mandatory directive and does not confer any discretion in carrying out the action so directed.’ ” 2008 SD 111, 1121, 757 N.W.2d 756, 762 (quoting SDCL 2-14-2.1) (emphasis added). There is a distinction between policy making discretion and operational judgment. The defendants were not creating policy. This statute does not require an exercise of discretion. Rather, the employees were only required to make a factual judgment regarding the conditions of the road. This is the only interpretation consistent with the plain language of the statute, and which preserves legislative intent. Obviously, the Legislature intended South Dakota travelers to be protected from and warned about these points of danger, blind crossings, and sharp turns.
[¶ 54.] Curiously, the majority opinion, also penned by Chief Justice Gilbertson, claims that the duties set forth in SDCL 31-28-6 under the directive of the word “shall,” are in fact discretionary duties, rather than mandatory. With all due respect, it is preposterous to attach opposite definitions to the same word just to achieve a certain result. If we interpret SDCL 31-28-6 to be entirely discretionary, as the majority purports to do, the employees could ALWAYS avoid liability by simply and arbitrarily saying the intersection was not a point of danger, blind crossing, or sharp turn, despite compelling evidence to the contrary. To interpret SDCL 31-28-6 in this manner would render useless the mandatory directive “shall.” Moreover, that interpretation “is precisely the kind of absurd result we have always said our statutory interpretation should avoid.” Dep’t of Social Services ex rel. Wright v. Byer, 2004 SD 41, ¶ 17, 678 N.W.2d 586, 590-91. If the Legislature intended the duties to be discretionary, it would have chosen more appropriate statutory language.
[¶ 55.] Rather, in accordance with the mandatory directive, the defendants had no discretion in deciding whether to erect and maintain the appropriate signage if there was any sharp turn, blind crossing, or other point of danger. If any of these conditions existed, the defendants were required to follow the law and construct the signs. Truman claims that the Four Corners intersection qualifies as a sharp turn, a blind crossing,[21] and a point of danger. Conversely, Griese claims that this intersection does not meet any of those three characterizations. Importantly, whether one or more of these conditions in fact existed raises a genuine issue of material fact as to each condition. Such a determination should be decided by a jury. Under these circumstances, summary judgment should not have been granted or affirmed.
[¶ 56.] Griese impliedly makes the alternative argument that even if the Four Corners intersection can be characterized as a sharp turn, blind crossing, or other point of danger, the statutory duty was *93 met because the double yellow line in the center of U.S. 14 indicates that northbound traffic on U.S. 14 must yield to incoming traffic from S.D. 34. Griese claims this double yellow line was sufficient to adequately warn of the danger. The double yellow line raises at least three genuine issues of material fact:[22] (1) whether a double yellow line is a substantial and conspicuous warning sign to the driver that he is required to yield to oncoming traffic before proceeding across that lane of traffic; (2) whether the double yellow line is “on the right-hand side of [each side of] the highway approaching such point of danger[;]” and (3) whether a double yellow line conforms to the standard uniform traffic control practices, for which South Dakota adopted the Manual on Uniform Traffic Control Devices (MUTCD) in the South Dakota Local Government Roads Signing Reference (SDLGRSR).[23]
[¶ 57.] Section 2B of the MUTCD states that “regulatory signs shall be used to inform road users of selected traffic law or regulations and indicate the applicability of the legal requirements.” MUTCD 2B.01, Application of Regulatory Signs (Plaintiffs Exhibit 6). If Griese and the DOT expected the double yellow line to serve as an indicator that north-bound traffic was to yield, and not just that passing was prohibited on this stretch of road,[24] then a regulatory sign may be mandatory under this section.
[¶ 58.] Each of these points raises genuine issues of material facts as to whether the double yellow line meets both the plain language of SDCL 31-28-6 and the requirements of the MUTCD section 2B.01. These are issues that should be decided by a jury. See Fritz, 1997 SD 122, ¶ 16, 570 N.W.2d at 243. In this regard, the grant of summary judgment was again inappropriate.
[¶ 59.] Lastly and importantly, the Legislature made violation of this statute a Class 1 misdemeanor. If, as the majority holds, SDCL 31-28-6 provides the highway officer discretion to erect and maintain a substantial and conspicuous warning sign, then why did the South Dakota Legislature make it a crime to violate the statute? The answer is simple: the duties are not discretionary. Criminalizing discretionary duties defies common sense. This is a fatal defect to the majority’s reasoning. Understandably, the Legislature wants its citizens safe from perilous highway conditions that may be known to the highway department, but unknown to the drivers of the road. Griese had a duty to abide by the statute under certain circumstances, and failure to do so would be a Class 1 misdemeanor.

Case Law

[¶ 60.] South Dakota case law supports the determination that summary judgment was improper here. In Hansen v. South *94 Dakota Department of Transportation, 1998 SD 109, 584 N.W.2d 881, the plaintiff suffered bodily injury when her right front car wheel dropped into a hole that a construction crew created on a bridge on Interstate 29. Hansen appealed the trial court’s decision to grant the defendant’s motion to dismiss based on sovereign immunity.' In affirming the lower court, this Court noted that when a decision cannot be measured against a predictable standard of care then the task is discretionary, thus invoking sovereign immunity. Id. ¶ 23 (quoting 57 Am.Jur.2d Municipal, County, School & State Tort Liability § 120, at 132-33 (1988)). Based on this holding, Griese claims that Hansen awards the governmental entity sovereign immunity under any set of facts. That conclusion is incorrect.
[¶ 61.] Griese and the majority opinion fail to acknowledge that in Hansen, we observed that “ ‘[w]here ... a standard of care may be defined and applied with relative ease, the public servant is not similarly deterred and the public interest in the protection of the official weakens.’ ” Id. ¶ 31 (quoting DuBree v. Commonwealth, 481 Pa. 540, 393 A.2d 293, 295 (1978)) (emphasis added). The standard may be “written or the product of experience,” id. ¶ 23, and other jurisdictions have noted that if the MUTCD mandates the traffic control device, it is not discretionary. Id. ¶ 31 (quoting Patton v. City of Cleveland, 95 Ohio App.3d 21, 641 N.E.2d 1126, 1130 (1994)). Both SDCL 31-28-6 and the MUTCD dictate the governing standards for erecting and maintaining roadway signage, and the officer simply needs to make a factual determination of whether the statutory conditions exist, thereby requiring him to carry out his statutory duties. Importantly, Hansen did not declare that a violation of SDCL 31-28-6 is always discretionary. In fact, the result in Hansen may well have been different had the defendant who was sued in Hansen been the manager of the road repair crew, instead of the Secretary of Transportation and Director of Highways in charge of over 1,300 employees and a budget of nearly $270,000,000 in 1994. See id. ¶22. Obviously, as the Secretary of Transportation and Director of Highways, his duties were generally discretionary and he was not the manager of the road crew. The instant case, however, involves the DOT Pierre Region Traffic Engineer and DOT employees — the precise people charged with carrying out this statutory duty.
[¶ 62.] Even if the duties set forth in SDCL 31-28-6 were discretionary, a fact which I do not concede, summary judgment is improper if there are genuine issues of material fact. To support this proposition, Truman cites several cases. In particular, he claims Wulf, 2003 SD 105, 669 N.W.2d 135; Kyllo, 535 N.W.2d 896; National Bank of South Dakota, 325 N.W.2d 845; and Bego, 407 N.W.2d 801, support his argument.
[¶ 63.] In Wulf, 2003 SD 105, ¶ 4, 669 N.W.2d at 138, the DOT contracted out its winter road maintenance duties to Pre-heim Lawn and Landscape, Inc. The DOT had established a winter safe highway maintenance plan for snow removal, sanding and deicing as required by SDCL 31-5-8.3. In particular, the sanding policy required the use of a specified sand/salt/chemical mixture and to commence sanding at “5:00 a.m. [and continue] until 7:00 p.m.... unless (1) the traffic is moving safely or (2) conditions become too hazardous for continued operations.” Id. ¶ 31. While the trial court granted summary judgment because “the decision to stop plowing and sanding due to its ineffectiveness was a judgment call,” this Court held that the trial court’s grant of summary judgment was improper because *95 there were disputed issues of material facts regarding the effectiveness of sanding, whether the traffic was moving safely, and whether the proper sand/salt/chemical mixture was used. Id.
[¶ 64.] The concurrence in part and dissent in part in Wulf noted that “[t]he distinction between creating and implementing government policy should not be ignored when determining whether sovereign immunity applies.” Id. ¶ 43 (Sabers, J., concurring in part and dissenting in part). “Creating governmental policy requires discretion and is entitled to sovereign immunity protection. Implementing governmental policy is ministerial and is not entitled to sovereign immunity protection.” Id. (emphasis in original); see also id. ¶ 32 (majority opinion) (“ ‘[0]nce it is determined that the act should be performed, subsequent duties may be considered ministerial.’ ” (quoting Hansen, 1998 SD 109, ¶ 23, 584 N.W.2d at 886)). Furthermore, the concurrence/dissent in part noted that “[although [the defendants] had some discretion as to how and when to perform their duties, that discretion did not rise to the level of creating policy or shield them from liability for negligence, if proven.” Id. ¶ 53 (emphasis in original). See also cases cited in ¶ 52, supra; Elton v. County of Orange, 3 Cal.App.3d 1053, 1058, 84 Cal.Rptr. 27, 30 (1970) (decisions regarding foster children “may entail the exercise of discretion in a literal sense, but such determinations do not achieve the level of basic policy decisions, and thus do not [warrant immunity]”).
[¶ 65.] This case is similar to Wulf. There, the DOT policy mandated the roads be sanded from 5 a.m. to 7 p.m. unless certain factual circumstances existed. Here, the Legislature mandated that warning signs be erected and maintained if certain factual circumstances existed. In Wulf, we determined that whether those certain factual circumstances existed created a genuine issue of material fact to be decided by the jury. Here, whether certain factual circumstances exist similarly creates genuine issues of material facts to be decided by the jury. Summary judgment was improper in Wulf, and therefore is similarly improper here.
[¶ 66.] Likewise, Kyllo, 535 N.W.2d at 903, Leir, 325 N.W.2d at 848, and Bego, 407 N.W.2d at 805, all reaffirmed the principle that state employees should be held liable for negligently performing ministerial acts. These cases imply that a jury trial should be afforded so the employee’s liability, if any, can be determined.
[¶ 67.] Furthermore, we presume the Legislature is aware of two of our cases, Fritz, 1997 SD 122, 570 N.W.2d 240, and Braun v. New Hope Township, 2002 SD 67, 646 N.W.2d 737, where sovereign immunity was waived for violations of SDCL 31-28-6. Specifically, in Braun, we noted that “SDCL 31-28-6 requires townships to erect ‘substantial and conspicuous warning sign[s]’ on the right-hand side of the highway for ‘point[s] of danger.’ ” 2002 SD 67, ¶ 17, 646 N.W.2d at 741 (emphasis added). This is hardly the type of language that leads one to the result that SDCL 31-28-6 relieves an actor of liability for failure to erect a sign.
[¶ 68.] The majority’s conclusion in this case directly conflicts with our recent cases of Bickner v. Raymond Township, 2008 SD 27, 747 N.W.2d 668, and King, 2007 SD 2, 726 N.W.2d 603. In Bickner, summary judgment was affirmed in part because “Bickner cite[d] no provision in the MUTCD that specifically requires a township to erect a warning sign in these circumstances.” 2008 SD 27, ¶ 14, 747 N.W.2d at 672 (citation omitted). Here, Truman claims that the curve is an “acute angle curve.” MUTCD has “designated the ‘acute angle intersection’ as one of its *96 typical examples for placement of warning signs at intersections.” Importantly, Bick-ner did not declare that the governmental entity is always immune from liability under any factual circumstances. Likewise, in King, summary judgment was affirmed because the plain language of the MUTCD provision only required a single sign to be placed at the culvert, not two double sided signs as advocated by the plaintiff. 2007 SD 2, ¶¶ 19-21, 726 N.W.2d at 609-10. Therefore, these cases are distinguishable from the case before us.
[¶ 69.] MUTCD Figure 2A-2 depicts an acute angle intersection. This figure and the accident site have the exact same design. Compare Attachment 3 with Attachment 1 (depiction of accident site at the merging of U.S. 14 and S.D. 63). See also Attachment 2. The majority opinion is mistaken in its determination that the figure differs from the accident site because the figure shows a stop sign whereas the U.S. 14/S.D. 63 junction is a “free flow” traffic design with no stop sign.[25] That is Truman’s point: the acute angle intersection is a road design for which the MUTCD designates proper placement for a stop sign. Because the U.S. 14/S.D. 63 junction lacked a stop sign, it failed to conform to the MUTCD’s specifications. Further, the majority’s statement that the two designs are different because “traffic on U.S. 14 does not make a right-hand ‘sharp turn’ onto S.D. 63” is without merit. A driver on U.S. 14 could just as easily make a right-hand sharp turn onto S.D. 63, as could be done at the acute angle intersection depicted in Figure 2A-2 of the MUTCD.[26] The geometrical and traffic designs of the accident site are the exact same as depicted in the figure. Therefore, Griese violated his statutory duty by not “erect[ing] and maintaining] at points in conformity with standard uniform traffic control practices [MUTCD] ... a substantial and conspicuous warning sign[.]” See SDCL 31-28-6.
[¶ 70.] Truman also contends that the Four Corners intersection is a known “point of danger.” He claims DOT traffic and safety engineer Cliff Reuer had knowledge that the intersection contains two “points of conflict,” only one of which is controlled by a stop sign. According to Reuer, crossing a lane of traffic is a point of conflict. Truman’s expert Dave Dau-bert noted that “[t]hese ... intersections have been judged a problem for at least the past 40 years and need to be replaced or signed to eliminate conflicting movements .... As long ago as 1954, manuals were prepared indicating that Y intersections were a problem in regards to right-of-way assignment.”[27] Stop signs, yield signs, other regulatory signs, or warning signs are generally used to prevent acci *97 dents at potential “points of danger.” MUTCD section 2B.05 provides guidance as to when stop signs, for example, should be erected.[28] The existence of any of the conditions listed in section 2B.05, or any of the applicable sections for other signs, creates genuine issues of material facts to be decided by a jury. Thus, under these circumstances, summary judgment was improper, and this Court should reverse.
[¶ 71.] Lastly, the Minnesota court of appeals case, Ostendorf u Kenyon, 347 N.W.2d 834 (Minn.Ct.App.1984), provides guidance in this situation. In Ostendorf, the victims collided on a stretch of highway that had three lanes: two west-bound lanes separated from a single east-bound lane by double yellow lines. The traffic signs on this highway, however, complied with MUTCD.
[¶ 72.] Ostendorfs sued the state alleging it failed to warn of the hazards of this road through adequate signage. The lower court granted the State’s motion for summary judgment on the defense of sovereign immunity. The Minnesota Court of Appeals reversed the summary judgment noting that “[a] discretionary act is one which requires a balancing of complex and competing factors at the planning, rather than the operational, stage of development.” Id. at 837 (emphasis added). Furthermore, the court noted that complying with the MUTCD is not enough. Minnesota had a statute providing that the “commissioner may construct and maintain other directional signs upon the trunk highways.” The court noted that, according to the statute,
[T]he legislature apparently contemplated that at some point in the operation and maintenance of a highway, it would become apparent that additional signs were needed. That is the point where the discretion in how to originally place warning signs is exhausted and, as part of maintaining the highway, the State has a duty to erect more or better signs.
Id. at 838 (emphasis added). Finally, the court noted that the plaintiff provided evidence that the highway had a history of accidents and the state failed in its duty to safely maintain the highway by not placing better or additional warning signs on this stretch of road. The court found that the plaintiffs had, therefore, raised a material issue of fact as to whether the state was negligent in not placing more or better warning signs on the highway. Importantly, the court concluded:
The State’s placement of warning signs on the highway was not a discretionary act after the State had knowledge of a dangerous situation where warning could be provided by additional or better signs. Here the appellants raised an issue of material fact as to whether the state was negligent in the maintenance of its highway and summary judgment was not appropriate.
Id. Not only does the South Dakota statute create a duty to erect and maintain warning signs under certain circumstances, but also, here, the state knew that this stretch of highway created a danger *98 ous driving transition. The record reflects a similar accident occurred in the past, additional accidents have occurred at this intersection and there have been several “terrifying ‘near misses.’ ” Stanley County Sheriff Rathbun recalled that on occasion, people have come into his office to report the “near misses.” Just as summary judgment was not appropriate in Os-tendorf, it was not appropriate in this case based on these additional facts.
CONCLUSION
[¶ 73.] In summary, there are at least eight reasons why summary judgment should not have been granted by the trial court, and affirmed by the majority of this Court:
1. The South Dakota Legislature enacted statutes authorizing the state to obtain liability insurance and waive sovereign immunity “to the extent of liability insurance coverage.” State employees are covered under the PEPL fund and sovereign immunity is waived, to the extent of coverage, for damages resulting from that employee’s failure to perform a ministerial duty. Statutory interpretation leads me to conclude that the duties set forth in SDCL 31-28-6 are ministerial, on more than one account (i.e., “shall,” policy-making discretion vs. operational judgment, and Class 1 misdemeanor classification).
2. The Legislature has not removed this specific failure to act from coverage under the PEPL fund; therefore, sovereign immunity is waived for this situation.
3. The state waived sovereign immunity by violating a mandatory duty imposed by SDCL 31-28-6 when it failed to erect and maintain substantial and conspicuous signs at the Four Corners intersection.
4. There are genuine issues of material facts as to whether this roadway constitutes a “sharp turn,” and whether a substantial and conspicuous warning sign was placed on the right-hand side of each side of the highway approaching such point of danger.
5. There are genuine issues of material facts as to whether this roadway constitutes a “blind crossing,” and whether a substantial and conspicuous warning sign was placed on the right-hand side of each side of the highway approaching such point of danger.
6. There are genuine issues of material facts as to whether this roadway constitutes any “other point of danger,” and whether a substantial and conspicuous warning sign was placed on the right-hand side of each side of the highway approaching such point of danger.
7. There are genuine issues of material facts as to whether the double yellow line is a substantial and conspicuous warning sign to the driver that he is required to yield to oncoming traffic before proceeding across that lane of traffic, whether the double yellow line is on the right-hand side of each side of the highway approaching such point of danger, and whether the double yellow line conforms to the MUTCD.
8. There are genuine issues of material facts as to whether crossing a lane of traffic is a point of conflict, and whether the Four Corners intersection meets the MUTCD signage requirements when such “intersections have been judged a problem for at least the past 40 years and need to *99 be replaced or signed to eliminate conflicting movements.”
[¶ 74.] Common sense and South Dakota law directs that the highway officer shall erect and maintain substantial and conspicuous warning signs under these circumstances. To decide otherwise on summary judgment, as the majority does, is a violation of both the United States and South Dakota Constitutions. See U.S. Const, amend. VII (“In [s]uits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.... ”); S.D. Const, art. VI, sec. 6 (“The right of trial by jury shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy....”). By affirming the trial court’s grant of summary judgment, this Court violates the plaintiffs state and federal constitutional rights to a jury trial, and undoubtedly, offends traditional notions of justice.
[¶ 75.] In accordance with our standard of review, this Court is required to view the facts in the light most favorable to the non-moving party. I disagree with the majority and conclude that genuine issues of material facts exist, requiring a reversal and remand for trial.
[¶ 76.] Chief Justice Gilbertson concludes with the argument that “one can only imagine the reaction of the average citizen if he or she” were “plucked off the street” and required to perform the duties of the engineers of the State Highway Department. I submit he is missing the whole point. The State Highway Department has over a thousand employees who are educated, trained, and equipped to do the jobs the Legislature has mandated them to do. Moreover, the average citizen as a juror continually makes determinations on others’ competence, skill, or lack thereof, or outright negligence.
[¶ 77.] In contrast, I submit that any right-thinking average citizen would be “shocked” to be presented with the substantial injuries, damages, hospitalizations, and the deaths of three people caused by the failure of this highway engineer to do his duty as mandated by the South Dakota Legislature, and then to be told by the majority of this Court that there is no remedy for these injuries and deaths, even though caused by “the want of ordinary care or skill.” See SDCL 20-9-1. Equally shocking to average South Dakota citizens may be the fact that the majority declares “no remedy” without even providing the constitutional right to a jury trial.
[¶ 78.] Incredibly, under the majority’s view, the Highway Department could arbitrarily, unreasonably, and capriciously design the busiest, most dangerous intersection in South Dakota without stop signs or signage of any kind and never be accountable, despite numerous injuries and deaths year after year.
[¶ 79.] Also incredible, under the majority’s view, the Highway Department could arbitrarily, unreasonably, and capriciously design the busiest, most dangerous intersection in South Dakota with inadequate signage or signage that goes out of repair, as here, and never be accountable, despite numerous injuries and deaths year after year.
[¶ 80.] I am not suggesting a directed verdict on liability, but rather a reversal and remand for a jury trial on the merits of this case in accordance with the state and federal constitutions.
[¶ 81.] MEIERHENRY, Justice, joins this dissent.
*100 [[Image here]]
*101 [[Image here]]
*102 [[Image here]]
*103 [[Image here]]

. In footnote 4, the majority claims Truman “presents the issue as [] all-encompassing[:] ‘regardless of the facts of any particular case.’ " Supra ¶ 8 n. 4. Truman's statement is taken out of context as he states the issue as follows: “Whether all claims for violation of the mandatory duty imposed by SDCL § 31-28-6 are barred under the doctrine of sovereign immunity, regardless of the facts of any particular case....” Clearly, Truman is not arguing that sovereign immunity should apply or not apply “regardless of the facts of any particular case” as implied by the majority. Rather, Truman is cautioning this Court to consider the far-reaching implications of its decision.

. It states, in pertinent part:
This Memorandum does not extend coverage or apply to any liability:
1. Assumed under contract, except this exclusion shall not apply to rental car contracts entered into by employees or to contracts specifically added by endorsement hereto;
2. Arising out of the ownership, maintenance or use of any aircraft except this exclusion shall not apply to the extent PEPL purchases insurance for such purposes;
3. Due to declared or undeclared war, riot, a concerted act of civil disobedience and similar occurrences or acts or conditions incident thereto. However this exclusion does not apply to liability arising from actions taken to protect persons or property;
4. Under workers' compensation, disability benefits, unemployment compensation or similar laws;
5. For bodily injury to an employee arising out of and in the course of employment by the State;
6. For injury to the spouse, child, parent, brother, or sister of the employee in 5, above, as a consequence of the bodily injury to that employee;
7. Arising out of the actual, alleged, or threatened discharge, release or escape of pollutants;
8. Resulting from or contributed to in any manner by the hazardous properties of nuclear material;
9. For injuries resulting from or contributed to in any manner by the presence of asbestos;
10. Arising from or contributed to in any manner by acts, errors or omissions in the engineering or design of any public roadway or public transportation project;
11. For back pay and benefits and any costs relating to reinstatement of an employee, except this exclusion does not apply to any damages which may be awarded to an employee under any federal law or as a result of violations of an employee's rights as guaranteed by the United States Constitution;
12. For employee grievances, actions and awards, except this exclusion does not apply to any damages which may be awarded to an employee under any federal law or as a result of violations of an employee’s rights as guaranteed by the United States Constitution;
13. For fines, penalties, punitive damages or exemplary damages;
*90 14. For failure to perform, or breach of, a contractual obligation;
15. Arising out of providing or the failure to provide medical professional services by employees of the University of South Dakota School of Medicine, except this exclusion shall not apply to employees of the University of South Dakota School of Medicine's Division of Health Sciences;
16. For damages that are a result of a discretionary act or task. This exclusion does not apply if the damages are the result of a ministerial act or task;
17. To the extent the occurrence is covered by any valid and collectible liability insurance, except this exclusion shall not apply to liability insurance of the employee that protects the employee while driving a State owned or leased vehicle;
18. For damages measured by contract, as set forth in SDCL ch. 21-2;
19. For damages to property owned by the State;
20. Arising out of the ownership, operation, engineering or design of any airport, landing strip or similar facility. However, this exclusion shall not apply to state-owned hangars in the cities of Brookings, Vermillion, and Pierre, South Dakota;
21. For refund of taxes, fees and assessments;
22. For claims where notice was not given by the claimant within 180 days after the injury or as required by SDCL ch. 3-21;
23. Arising out of the employee obtaining remuneration or financial gain to which the employee was not legally entitled;
24. Arising from collecting or attempting to collect taxes;
25. Arising from providing or attempting to provide emergency disaster relief services pursuant to SDCL ch. 33-15;
26. Arising from activities or facilities of the South Dakota Building Authority or its employees;
27. Arising from activities or facilities of the South Dakota Health and Educational Facilities Authority or its employees;
28. Arising from activities or facilities of the South Dakota Housing Development Authority or its employees except this exclusion shall not apply to the South Dakota Housing Development Authority, its commissioners, officers and employees, with respect to liability arising from the construction of residential and other structures under the Governor's House and Daycare Building Project at Mike Durfee State Prison in Springfield, South Dakota;
29. Arising from activities or facilities of the South Dakota Science and Technology Authority;
30. Arising out of the employee’s willful and wanton misconduct.
PEPL Memorandum of Liability Coverage to the Employees of the State of South Dakota 13-15. The specificity of several of the exclusions is notable.

. The record contains pictures and testimony indicating this Y configuration qualifies as a “blind crossing.” See Attachment 2.

. I fail to understand how the majority can deny there are genuine issues of material facts as to whether the officer "erect[ed] and maintained] ... substantial and conspicuous warning sign[s] on the right-hand side” of "each side of any sharp turn, blind crossing, or other point of danger[,]” and specifically, whether the double yellow line meets these statutory requirements.

. The Foreword to the SDLGRSR states: "this publication is made up primarily of excerpts taken from sections or parts of the Manual on Uniform Traffic Control Devices, 2003 Edition.” No differences between the two sources were found with regard to the sections pertinent to this case; therefore, references will be made only to the MUTCD to prevent confusion.

.The MUTCD explains a double yellow line "indicates that passing is prohibited in both directions on an undivided road or highway.” Manual on Uniform Traffic Control Devices, available at www.mutcd.fhwa.dot.gov (accessed on April 8, 2008).

. The "free flow” traffic design of this roadway, allowing for a vehicle in one lane of traffic to cross another lane of oncoming traffic, with no stop sign or signage whatsoever to alert either driver, only ■ accentuates the dangerousness of this roadway.

. It is far less important for there to be a stop sign where a roadway allows for a right-hand turn into a lane of traffic going in-the same direction, than where a roadway permits one to cross a lane of oncoming traffic, as in this case.

. Daubert’s report stated:
The manual used for establishing the alignment of roadways was developed by the American Association of State Highway Officials (AASHO) (which SD has adopted, see King, 2007 SD 2, ¶ 15, 726 N.W.2d at 608) with the first full book form published in 1954 as A Policy on Geometric Design of Rural Highways. The type of intersection which is the subject of this collision is described in the 1954 manual with recommendations on how to improve the safety of the Y intersection. Even after the curve for U.S. 14 was constructed, the signing and markings could have been installed to make the intersection safe.

. Specifically, it states:
STOP signs should be used if engineering judgment indicates that one or more of the following conditions exist:
A. Intersection of a less important road with a main road where application of the normal right-of-way rule would not be expected to provide reasonable compliance with the law;
15. Street entering a through highway or street;
C. Unsignalized intersection in a signalized area; and/or
D. High speeds, restricted view, or crash records indicate a need for control by the STOP sign.
MUTCD 2B.05 (2003).