#29901-aff in pt & rev in pt-PJD & SRJ
**2023 S.D. 66**

# IN THE SUPREME COURT
## OF THE
## STATE OF SOUTH DAKOTA

\* \* \* \*

| | |
|---|---|
| AUSTIN MCGEE, | Plaintiff and Appellee, |
| v. | |
| SPENCER QUARRIES, INC.,<br>a South Dakota Corporation, | Defendant, |
| and | |
| SOUTH DAKOTA DEPARTMENT OF<br>TRANSPORTATION; KENT GATES,<br>as an employee of the South Dakota<br>Department of Transportation; and KRIS<br>ROYALTY, as an employee of the South<br>Dakota Department of Transportation, | Defendants and Appellants. |

\* \* \* \*

## APPEAL FROM THE CIRCUIT COURT OF
## THE FIRST JUDICIAL CIRCUIT
## BRULE COUNTY, SOUTH DAKOTA

\* \* \* \*

## THE HONORABLE BRUCE V. ANDERSON
Judge

\* \* \* \*

| | |
|---|---|
| JAMES E. MOORE<br>JACOB R. SCHNEIDER<br>CHRISTOPHER A. DABNEY of<br>Woods Fuller Shultz & Smith, P.C.<br>Sioux Falls, South Dakota | Attorneys for defendants and<br>appellants. |

\* \* \* \*

ARGUED
OCTOBER 5, 2022
OPINION FILED **12/20/23**

\* \* \* \*

RONALD A. PARSONS, JR.
STEVEN M. JOHNSON of
Johnson, Janklow,
   and Abdallah, LLP
Sioux Falls, South Dakota

MICHAEL F. MARLOW of
Marlow, Woodward & Huff, Prof. LLC
Yankton, South Dakota               Attorneys for plaintiff and
                                        appellee.

#29901

DEVANEY, Justice, and JENSEN, Chief Justice

**[¶1.]** **Justice DeVaney delivers the majority opinion on Issues 1, 2, and 3(b). Chief Justice Jensen delivers the majority opinion on Issue 3(a).**

**[¶2.]** **DEVANEY, Justice, writing for the Court on Issues 1, 2, and 3(b).**

[¶3.] After Austin McGee rolled his pickup while driving on a portion of Highway 45 that was being resurfaced, he brought suit against the contractor responsible for the resurfacing project and against the South Dakota Department of Transportation (DOT) and several DOT employees. Relevant here is his suit against the DOT and its employees. McGee claims that the crash and his injuries resulted from the DOT employees' negligent failure to inspect and to ensure the contractor's compliance with the DOT standards governing the project, the requirements of the construction contract, and industry customs and practices. The DOT moved for summary judgment, asserting multiple defenses, including that sovereign immunity bars McGee's suit. The circuit court denied the motion, and this Court granted the DOT's petition for intermediate appeal.

[¶4.] We affirm the circuit court's decision rejecting the DOT's claims that McGee's suit is barred under the law governing a third-party beneficiary's standing to seek damages for a breach of contract and that McGee failed to plead an actionable duty. We further affirm the court's decision denying the DOT's motion for summary judgment on the question whether the DOT's Standard Specification 330.3(E) set forth a ministerial duty not protected by sovereign immunity. However, because neither the Federal Highway Administration's Manual on

-1-

Uniform Traffic Control Devices (MUTCD) nor a document the parties refer to as "the Hot Mix Handbook" set forth ministerial duties for the actions at issue in this case, we reverse the portion of the court's denial of summary judgment relating to the precautionary measures McGee alleges the DOT should have taken and remand for further proceedings consistent with this opinion.

## Factual and Procedural Background

[¶5.]        On Saturday morning, June 30, 2018, McGee was driving his pickup on Highway 45 north of Platte, South Dakota.  His brother was seated in the front passenger seat and there was light precipitation, making the roadway wet.  According to McGee, he lost control of his pickup after unexpectedly encountering exposed tack on the highway.  Tack coat is a liquid asphalt emulsion that is applied between layers of asphalt.  McGee claimed that after encountering the exposed tack, he could not maintain control of his pickup and it left the road and rolled.  As a result of the accident, McGee suffered serious injuries, including permanent paraplegia.

[¶6.]        On October 2, 2018, McGee brought suit against Spencer Quarries, Inc., the company with whom DOT had entered into a contract for the resurfacing project at issue.  McGee asserted that tack coat is known in the industry to be a hazard to the traveling public and alleged that Spencer Quarries negligently left approximately 1,400 feet of exposed tack coat on the highway without posting proper warnings and without placing sand, gravel, or other traction aid on top of the exposed tack-coated surface.  McGee amended his complaint in January 2020, adding as additional defendants the DOT and employees Jay Peppel, Kent Gates,

and Kris Royalty. This appeal concerns McGee's allegations against the DOT and its employees (collectively referred to as the DOT unless a reference to an individual is necessary).

[¶7.] The DOT and Spencer Quarries entered into a contract in October 2017 for the resurfacing of a segment of Highway 45, including where McGee's accident occurred. The contract included "Plan Documents" governing Spencer Quarries' execution of the resurfacing project. The contract also incorporated the DOT's Standard Specifications for Roads and Bridges 2015 (Standard Specifications), and these Standard Specifications incorporated by reference the MUTCD. Peppel was assigned as the "Area Engineer" to oversee the contract, and he assigned Gates as the "Project Engineer" to supervise the project. Royalty, a road technician, was the "Project Inspector" tasked with inspecting Spencer Quarries' work each day.

[¶8.] In his amended complaint, McGee alleged that "[t]he Plan Documents, Standard Specifications, and other pertinent resources state, define, and delineate the DOT's duties regarding the Project." He then asserted that the DOT was "required to follow the Plan Documents, the Standard Specifications, and industry custom and practice on the Project." In particular, he quoted the language in Standard Specification 4.5 that required Spencer Quarries to "keep the portion of the project used by public traffic in a condition that will adequately and safely accommodate traffic." McGee also noted the language in Standard Specification 5.15 that required Gates to notify Spencer Quarries of its noncompliance with

Standard Specification 4.5 and to maintain the project for the safety of the traveling public if Spencer Quarries did not remedy the unsatisfactory condition.

[¶9.]        McGee further alleged that Spencer Quarries did not comply with Standard Specification 330.3(E), which provides that "[t]ack application ahead of mat laydown . . . shall not exceed the amount estimated for the current day's operation unless ordered or allowed by the Engineer."  He noted that the DOT "did not knowingly order or allow Spencer Quarries to leave exposed tack coat" on the highway on June 30, 2018, the date of his accident.  He also claimed that the DOT "knew or should have known the exposed tack coat on the asphalt road surface at the crash scene on June 30, 2018 reduced friction available to vehicles traveling on the surface."  He further asserted that industry standards dictate that vehicle traffic should generally not be allowed to travel on exposed tack, and that if allowing travel is necessary, proper precautions must be taken, such as reducing the posted speed limit or sanding the surface.  According to McGee, the DOT failed to inspect, ensure, or inquire about Spencer Quarries' plan to safely and adequately accommodate traffic traveling over the exposed tack.  McGee also asserted that the DOT failed to notify Spencer Quarries of its obligation under the Plan Documents and Standard Specifications to display traffic control signs, specifically, a "Fresh Oil" sign.

[¶10.]        In regard to the negligence claims against the particular DOT employees, McGee claimed that Peppel breached duties owed by not suspending work improperly performed by Spencer Quarries, by failing to reject Spencer Quarries' defective work on the project, and by not remediating Spencer Quarries'

failure to correct the unsafe conditions for the traveling public. McGee claimed that Gates breached his duties to notify Spencer Quarries of its non-compliance with the Standard Specifications, Plan Documents, and contract; to ensure that Spencer Quarries adequately and safely accommodated the traveling public; and to maintain the project for the safety of the traveling public as required by Standard Specification 5.15. In regard to Royalty, McGee alleged that he breached his duties to inspect Spencer Quarries' work, recognize that it did not comply with the Standard Specifications and Plan Documents, and reject it as non-compliant. In McGee's view, the DOT is vicariously liable because Peppel, Gates, and Royalty were, at all material times, under the DOT's supervision, employ, and control when they breached their respective duties.

[¶11.]     The DOT, Peppel, Gates, and Royalty denied liability and filed a motion to dismiss, asserting that McGee failed to identify a legal duty owed to him. The DOT further claimed that even if such a duty existed, sovereign immunity would bar McGee's claims because the acts complained of were discretionary, rather than ministerial. In response, McGee acknowledged that he "did not allege that a general statute created a ministerial duty"; rather, he asserted that the Standard Specifications, Plan Documents, and MUTCD created mandatory duties. The circuit court granted the motion to dismiss as to employee Peppel because the court viewed his acts as discretionary, but the court denied the motion as to the DOT, Gates, and Royalty. The DOT filed a petition to this Court for an intermediate appeal of the circuit court's ruling, but we denied the petition.

[¶12.]        After the parties conducted additional discovery, the DOT filed a motion for summary judgment, again asserting that sovereign immunity bars McGee's claims. The DOT also claimed that even if sovereign immunity does not apply, McGee's claims fail as a matter of law because McGee did not plead an actionable duty. The DOT further asserted that McGee could not seek damages from the DOT because he is not a third-party beneficiary of the contract between the DOT and Spencer Quarries. The circuit court held a hearing on the motion and at the conclusion of the hearing, took the matter under advisement. Thereafter, McGee filed a motion for a continuance pursuant to SDCL 15-6-56(f) to conduct discovery to oppose the DOT's motion for summary judgment. The DOT objected, and after a hearing, the circuit court granted McGee's motion to conduct additional discovery.[1]

[¶13.]        After McGee conducted additional discovery and the parties submitted additional briefing, the circuit court issued a memorandum decision incorporating its prior decision denying the DOT's motion to dismiss and again holding that the DOT is not entitled to sovereign immunity. The court determined that pursuant to Standard Specification 5.10, Gates and Royalty were to inspect all work done on the contract and could not waive any part of the contract or issue contrary directives. The court further noted the requirement in the Standard Specifications that the DOT engineer is required to maintain the project if the contractor fails to comply

---

1.     When McGee was conducting additional discovery, he settled his claims against Spencer Quarries. The terms of the settlement agreement are not in the record.

with Standard Specification 4.5 and does not remedy the noncompliance within 24 hours.

[¶14.] In regard to the requirement in the Standard Specification related to tack, the circuit court determined that it sets "a certain and definite duty" while also allowing "some leeway or discretion" in implementation. However, the court determined that even if estimating the amount of tack for the current day's operation is a discretionary decision, the DOT employees "ignored the specifications requiring them to avoid leaving exposed tack coat to the driving public, and that when they could not avoid it they failed to take precautionary measures to reduce speed or warn the public of the hazard in the area of exposed tack coat."

[¶15.] The circuit court also noted that DOT employees and contractors who work on resurfacing projects in South Dakota are required to take a training course put on by the DOT and that the DOT distributes to the employees and contractors the Hot Mix Handbook as part of this training course. In regard to this handbook, the court noted that it "is a nationally recognized authoritative resource and industrial guide used in similar trainings" and then relied on the language in the handbook in determining that Gates's and Royalty's duties were ministerial. Finally, the court relied on the Standard Specifications requiring signage to warn the traveling public of roadway surface treatment as indicated by the MUTCD,

specifically, a "Fresh Oil" sign. However, the court acknowledged the DOT's claim that this sign is not required once the tack has broken.[2]

[¶16.] Ultimately, the circuit court determined the duties owed by Royalty and Gates were ministerial because they "were binding upon them as the Standard Specifications were to be followed and they were prohibited from waiving them or giving contrary instructions." The court deemed inapplicable the DOT's third-party beneficiary argument because McGee's tort claims relate to the DOT's alleged breach of its ministerial duties created by the Standard Specifications and are not based on a claim that he was entitled to the benefits of the contract between the DOT and Spencer Quarries.

[¶17.] The circuit court denied the DOT's motion for summary judgment, and the DOT again petitioned this Court for a discretionary appeal pursuant to SDCL 15-26A-13, which we granted. On appeal, the DOT asserts three arguments, which we restate as follows:

1.  Whether McGee's suit against the DOT is precluded under the law governing a third-party beneficiary's standing to seek damages for a breach of contract.

2.  Whether McGee failed to plead an actionable duty.

3.  Whether the acts at issue were discretionary and therefore protected by sovereign immunity.

---

2.  According to the DOT, "tack is wet when applied but eventually will 'break' when the solvents and water in the oil evaporate[.]" Tack was also described as broken when it turns from brown to black.

## Standard of Review

[¶18.] It is well settled that "[w]e review a [circuit court's] grant or denial of summary judgment de novo." *Davies v. GPHC, LLC*, 2022 S.D. 55, ¶ 17, 908 N.W.2d 251, 258 (second alteration in original) (quoting *Sheard v. Hattum*, 2021 S.D. 55, ¶ 22, 965 N.W.2d 134, 141). "Summary judgment is only appropriate when the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits of the parties, reveal that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Wulf v. Senst*, 2003 S.D. 105, ¶ 17, 669 N.W.2d 135, 141.

## Analysis and Decision

### 1. Whether McGee's suit against the DOT is precluded under the law governing a third-party beneficiary's standing to seek damages for a breach of contract.

[¶19.] The DOT claims that McGee's negligence suit is premised on the DOT's alleged breach of certain provisions in the documents incorporated into Spencer Quarries' contract with the DOT—the Plan Documents, Standard Specifications, and the MUTCD. The DOT then asserts that under *Sisney v. State*, 2008 S.D. 71, 754 N.W.2d 639, McGee cannot institute this suit against the DOT because he is not a third-party beneficiary of this contract. The DOT further asserts it is not subject to tort liability because McGee has not identified a breach of a legal duty independent of the contract. *See Knecht v. Evridge*, 2020 S.D. 9, ¶ 60, 940 N.W.2d 318, 335 (recognizing that tort liability must arise "from extraneous circumstances, not constituting elements of the contract" (citation omitted)). In

response, McGee claims that he "is not suing for breach of contract or seeking to enforce any contract"; thus, in his view, third-party beneficiary law is inapplicable here. He also contends that the independent tort doctrine is inapplicable because he is not a party to any breach of contract claim against the DOT.

[¶20.] In *Sisney*, the Court recognized that "[a] contract made *expressly* for the benefit of a third person may be enforced by him at any time before the parties thereto rescind it." 2008 S.D. 71, ¶ 10, 754 N.W.2d at 643 (quoting SDCL 53-2-6). *Sisney* further noted that when a government "contract is involved, private citizens are presumed not to be third-party beneficiaries." *Id.* ¶ 11, 754 N.W.2d at 644.

[¶21.] Here, although a government contract is involved, McGee is not seeking the relief that would be afforded to either the DOT or Spencer Quarries for a breach of the contract, nor is he seeking to enforce the contract. Rather, he instituted this tort claim for damages based on his view that the DOT breached "ministerial duties owed as the result of requirements imposed by statute, mandatory policies formally adopted by SDDOT in Standard Specifications independent of any particular contract, and the MUTCD." While it must be determined whether such duties exist, the nature of McGee's claim does not implicate third-party beneficiary law. Similarly, because McGee is not a party to the DOT/Spencer Quarries contract, the independent tort doctrine does not apply. As is evident in our past cases, the independent tort doctrine may be at issue when a *party to a contract* brings a tort suit against the other contracting party. *Knecht*, 2020 S.D. 9, 940 N.W.2d 318; *Kreisers Inc. v. First Dakota Title Ltd. P'ship.*, 2014

S.D. 56, 852 N.W.2d 413; *Fisher Sand & Gravel Co. v. S.D. Dep't of Transp.*, 1997 S.D. 8, 558 N.W.2d 864. The circuit court properly rejected this claim by the DOT.

### 2. *Whether McGee failed to plead an actionable duty.*

[¶22.] The DOT contends that a negligence claim against the State related to its duty of care to maintain a highway must be premised on a specific statutory duty, not on common law or industry customs and practices.[3] In the DOT's view, this requirement is supported by the "long line of decisions including *Hohm v. City of Rapid City*, 2008 S.D. 65, 753 N.W.2d 895, and *Dohrman v. Lawrence County*, 143 N.W.2d 865 (S.D. 1966)." In particular, the DOT relies on the language in *Dohrman* that "the duty imposed upon the county to protect the public from injury occasioned by defective highways and bridges and consequently the standard of care cannot be predicated on principles of common law negligence"; "liability must be determined from the standard of conduct imposed by the statute[.]" *See* 143 N.W.2d at 867. From *Hohm*, the DOT quotes language indicating the Legislature's intent, by enacting statutes like SDCL 31-28-6 and SDCL 31-32-10, to abrogate "cities' common-law duties respecting streets" and "to design a complete scheme of

---

3. McGee claims that the DOT failed to assert this particular argument before the circuit court or cite the cases on which it now relies to support this argument on appeal and thus waived appellate review of this issue. McGee alternatively claims that statutory duties exist via SDCL 31-28-6 and SDCL 31-28-11. In its reply brief, the DOT contends McGee waived the right to assert that a specific statutory duty exists because he did not identify a statutory duty before the circuit court. A review of the proceedings below reveals that the question whether a statutory duty exists was squarely before the circuit court. The DOT made the specific argument that McGee failed to identify "any laws under which he alleges that [the DOT] violated any duties." The DOT then further noted that it would "construe [McGee's] claims for negligence" to be "under SDCL 31-5-11 and SDCL 31-28-6."

responsibility and liability for highway maintenance such that its requirements should be the only ones that were obligatory." 2008 S.D. 65, ¶¶ 17, 20, 753 N.W.2d at 904–05. The DOT then directs the Court to other cases in which highway maintenance claims against the State have been premised on a statutory duty. *See Truman v. Griese*, 2009 S.D. 8, 762 N.W.2d 75 (SDCL 31-28-6); *Hansen v. S.D. Dep't of Transp.*, 1998 S.D. 109, 584 N.W.2d 881 (SDCL 31-5-1, SDCL 31-28-6, and SDCL 31-32-10); *Wulf*, 2003 S.D. 105, 669 N.W.2d 135 (SDCL 31-5-8.3).

[¶23.]     In response, McGee contends that neither *Dorhman* nor *Hohm* are applicable under the circumstances. He notes that *Dohrman* related to the alleged negligence of the public *entity*, whereas the allegations here relate to individual negligence on the part of the employees because of their breach of ministerial duties imposed by the Standard Specifications and the MUTCD. More specifically, he notes that unlike the claims in *Hohm* and *Dohrman* against a county or city related to injuries resulting from damaged or defective roads and highways that lacked warning signs, his claims arise because of "negligent acts and omissions committed by specific individuals in violation of their ministerial duties in the course of an operational *activity*, limited in duration, that of resurfacing a highway." Thus, he argues that under cases such as *State v. Ruth*, 9 S.D. 84, 68 N.W. 189 (1896) and *Kyllo v. Panzer*, 535 N.W.2d 896 (S.D. 1995), he has a right to institute a suit against a State employee for negligent acts related to the performance of ministerial duties. In particular, he quotes the language from *Kyllo* that "[a]n injured person's right to sue the negligent employee of an immune public entity derives from the

common law, and we will not lightly infer a legislative abrogation of that right absent a clear expression of intent."[4]  535 N.W.2d at 898–99.

[¶24.]       The DOT does not dispute these general principles with respect to a State employee's liability for negligence when performing ministerial acts. However, because McGee's suit concerns negligence related to the maintenance of a highway, it argues that under *Dorhman* and *Hohm*, the duties owed by the DOT and its employees related to the claims here must derive from statute, not the common law.  But *Dohrman* and *Hohm* specifically addressed the liability of *cities and counties*, not the State, in light of the evolution of legislative enactments specifically governing the liability of these local entities.  This Court has not before been asked to address whether or how the holdings in *Dohrman* and *Hohm* apply to negligence claims against the State or its employees.[5]  But given the nature of McGee's claims here, there is no need to look to common law negligence principles to identify an actionable duty because, as noted in the DOT's briefs to the circuit court and to this Court, our prior cases have already identified statutes from which the duties owed to McGee are derived.

---

4.     McGee also notes the Court's recognition in *Kyllo* that the Legislature has codified this right in SDCL 20-9-1 ("[e]very person is responsible for injury . . . caused by his want of ordinary care or skill") and SDCL 21-1-1 ("[e]very person who suffers detriment from the unlawful act or omission of another may recover from the person in fault . . ."). 535 N.W.2d at 899.

5.     The legislative enactments in *Hohm* and *Dohrman* were the predecessors of what was later codified in SDCL 31-32-10.  This statute retained the language from a prior version generally referring to the duties of "the governing body responsible for the maintenance of [the] highway" but no longer includes language that was contained in the earlier statutes specifically referring to causes of action against counties, townships, and cities.

[¶25.]     In *Wulf*, the DOT had contracted with Preheim Lawn and Landscape, Inc. to provide winter road maintenance over Highway 42 and made certain DOT employees (Senst and Bultje) responsible for the specific decisions related to snow and ice removal on the highway. 2003 S.D. 105, ¶ 4, 669 N.W.2d at 138. After a tragic accident on the highway due to icy and slippery road conditions, two different lawsuits were filed against various defendants, including Preheim Lawn and Landscape, Senst, and Bultje. *Id.* ¶¶ 14–15, 669 N.W.2d at 140–41. The complaints alleged that Preheim Lawn and Landscape negligently maintained the highway and that Senst and Bultje knew or should have known that the company was not properly maintaining the highway. Senst and Bultje moved for summary judgment, asserting that sovereign immunity shielded them from liability. *Id.* ¶ 16, 669 N.W.2d at 141.

[¶26.]     On appeal from the circuit court's decision granting Senst and Bultje summary judgment, the Court observed that Highway 42 is part of the State highway system; thus, the State is responsible for clearing snow and ice from the highway. *Id.* ¶ 4, 669 N.W.2d at 138. The Court also noted that under SDCL 31-4-14, the State "delegated responsibility for maintenance of its roads and highways to DOT." *Id.* (citing SDCL 31-4-14); *see also* SDCL 31-5-1 (providing that "[t]he Department of Transportation shall maintain, and keep in repair, all highways or portions of highways, including the bridges and culverts, on the state trunk highway system"). The DOT, in turn, adopted various policies governing winter road maintenance pursuant to the requirement under SDCL 31-5-8.3 that it "establish a winter safe highway maintenance plan." 2003 S.D. 105, ¶ 12, 669

N.W.2d at 139. Relying on the above statutes, the Court determined that the DOT's adoption of a policy related to sanding defined the duties owed by Senst and Bultje. *Id.* ¶ 32, 699 N.W.2d at 146.

[¶27.] Similarly here, the State has delegated to the DOT the responsibility for maintaining State highways, including the highway at issue here, Highway 45. SDCL 31-4-165 (providing that the State trunk highway system includes Highway 45). In addition, the Legislature has obligated the DOT to "advise and adopt standard plans and specifications for road, bridge, and culvert construction and maintenance suited to the needs of the different counties of the state and furnish the same to the several county superintendents of highways." SDCL 31-2-20. And in regard to warning signage, SDCL 31-28-6 imposes a duty on the DOT to "erect and maintain at points in conformity with standard uniform traffic control practices on . . . [a] point of danger on such highway, . . . a substantial and conspicuous warning sign."

[¶28.] Because the DOT is legally responsible for the maintenance of Highway 45 and has adopted, at the Legislature's directive, Standard Specifications governing projects related to the maintenance and repair of State highways, consistent with this Court's analysis in *Wulf* regarding the source of the duties owed, McGee has sufficiently alleged the existence of an actionable duty with respect to the resurfacing project at issue.

### 3. *Whether the acts at issue were discretionary and therefore protected by sovereign immunity.*

[¶29.] McGee's suit alleges individual negligence against State *employees*, and "it is well-settled that suits against officers of the state 'in their official

capacity, [are] in reality [suits] against the State itself.'" *Dan Nelson Automotive v. Viken*, 2005 S.D. 109, ¶ 23, 706 N.W.2d 239, 247 (alterations in original) (citation omitted). As the Court in *High-Grade Oil Co., Inc. v. Sommer* explained, an action against an officer of the State is deemed to be against the State. 295 N.W.2d 736, 737 (S.D. 1980). Therefore, McGee's action against the DOT and its employees is not maintainable unless sovereign immunity is waived.

[¶30.]    In *Wulf*, the Court explained that "State employees are immune from suit when they perform discretionary functions, but not when they perform ministerial functions." 2003 S.D. 105, ¶ 20, 669 N.W.2d at 142. The distinction between the two was most recently quoted in *Truman*:

> [A] ministerial act is defined as absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed designated facts or the execution of a set task imposed by law prescribing and defining the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion, being a simple, definite duty arising under and because of stated conditions and imposed by law. A ministerial act envisions direct adherence to a governing rule or standard with a compulsory result. It is performed in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action.

2009 S.D. 8, ¶ 21, 762 N.W.2d at 80–81 (emphasis omitted) (quoting *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886). "If the duties do not fall within [these] definition[s], they are not ministerial and thus are discretionary for this is the limits of the abrogation of sovereign immunity authorized by the Legislature." *Id.* (alterations in original) (citation omitted). Whether an act is discretionary or

ministerial is a question of law reviewed de novo.[6]  *Id.* ¶ 10, 762 N.W.2d at 78

(quoting *Bickner v. Raymond Twp.*, 2008 S.D. 27, ¶ 10, 747 N.W.2d 668, 671).

[¶31.]        The DOT contends that the circuit court erred in concluding "that

deciding how much tack to spray, whether to permit the public to travel on dried

tack, and whether to post signs were ministerial acts."  In the DOT's view, McGee

has failed to identify "a governing rule or standard with a compulsory result" that is

to be "performed in a prescribed manner without the exercise of judgment or

discretion as to the propriety of the action."  *See Truman*, 2009 S.D. 8, ¶ 21, 762

_____

6.    In concluding that the duties owed here were ministerial, the circuit court relied on factors this Court quoted in *King v. Landguth*, 2007 S.D. 2, 726 N.W.2d 603.  The factors come from the Restatement (Second) of Torts and were referenced in *National Bank of South Dakota v. Leir*, 325 N.W.2d 845 (S.D. 1982), but the Court did not ultimately apply all of them in determining that the acts at issue were ministerial.  Rather, the Court considered the existence of established criteria and standards governing whether an act is ministerial.  This approach is in line with how we have described a ministerial act in our more recent cases.  In regard to the Restatement factors, *Lier* identified them as matters to consider when deciding what constitutes a "discretionary function."  *Id.* at 848.  But aside from the first factor's nondescriptive reference to the "nature and importance of the function that the officer is performing," none of the other factors actually define what types of acts are discretionary versus ministerial.  Instead, the factors refer more generally to policy reasons why an injury-producing act performed by a government actor should or should not be deemed immune from suit.  Restatement (Second) of Torts § 895D (1979) (further referring to these factors as ones relating to the "consequences" of determining what is a discretionary act).  Notably, this Court has not cited these factors since 2007 and has never applied them as a governing standard when determining whether an act is ministerial.  In fact, the Restatement separately describes the features of ministerial acts, much like this Court has described them in *Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 80–81.  *See* Restatement (Second) of Torts § 895D (1979) (providing that ministerial acts are done by employees with "little choice as to when, where, how or under what circumstances their acts are to be done").  Because our more recent sovereign immunity cases discussing the distinction between ministerial and discretionary functions focus specifically on the nature of the acts in question, we decline to apply the less-helpful, policy-type factors from *King*.

N.W.2d at 81. In response, McGee claims that "Gates and Royalty had the specific, individual responsibility to ensure that [the] requirements" of the Standard Specifications, the MUTCD, and the Hot Mix Handbook were followed. In particular, he claims that Gates and Royalty were required to "inspect and ensure that no more tack coating is sprayed than is to be covered in that same day and—if for some reason that duty is violated—to warn of the slick surface treatment using the required W21-2 Fresh Oil signs[.]"

**[¶32.]** **JENSEN, Chief Justice, writing for the Court on Issue 3(a).**

> *a.* *Whether Standard Specification 330.3(E) sets forth a ministerial duty relating to the amount of tack coating applied each day.*

[¶33.] McGee argues that Standard Specification 330.3(E) created a ministerial duty requiring Gates and Royalty to "ensure only as much tack coat was sprayed as could be covered that day[.]" He does not allege that Gates and Royalty were negligent because they made an improper estimate, but rather because they failed to ensure that the "tack application ahead of mat laydown . . . [did not] exceed the amount estimated for the current day's operation[.]"[7]

---

7. Standard Specification 330.3(E) may be overridden if the Engineer orders or allows additional tack application than what is permitted by the Specification, but the undisputed evidence establishes that this never occurred. Peppel testified that he has never ordered or allowed a contractor to exceed the tack application established by the Specification and he is unaware of an engineer ever doing so. Gates testified that as the project engineer, he was not involved in estimating the amount of tack needed for the current day's operation and did not recall any discussions with the contractor about whether the amount of tack estimated for the day was correct. Gates further testified that he did not recall ordering or allowing the project's contractor to spray more tack coat than permitted by the Specification. Royalty testified that he and the contractor would get together

(continued . . .)

[¶34.]     *Truman v. Griese* provides the framework for distinguishing between ministerial and discretionary acts, but we have stated that the "determination of what acts constitute discretionary or ministerial functions requires an individualized inquiry." *King*, 2007 S.D. 2, ¶ 13, 726 N.W.2d at 608 (citing *Wulf*, 2003 S.D. 105, ¶ 21, 669 N.W.2d at 143). A "[p]roper analysis must avoid a mechanistic approach to the question and exemplifies the difficulties inherent in the ministerial/discretionary dichotomy." *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886. This Court has explained "that the distinction between discretionary and ministerial acts is often one of degree, since any official act that is ministerial will still require the actor to use some discretion in its performance." *Wulf*, 2003 S.D. 105, ¶ 23, 669 N.W.2d at 144 (quoting *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886). "[A] ministerial act is the simple carrying out of a policy already established . . . so that permitting state employees to be held liable for negligence in the performance of merely ministerial duties within the scope of their authority does not compromise the sovereignty of the state." *Id.* ¶ 20 (second alteration in original) (quoting *Ritter v. Johnson*, 465 N.W.2d 196, 198 (S.D. 1991)).

[¶35.]     Applying these rules leads to the conclusion that Standard Specification 330.3(E) creates a ministerial duty by requiring that the "[t]ack application ahead of mat laydown . . . shall not exceed the amount estimated for the

---

(. . . continued)

> to determine the amount of tack coat to put down for the day but did not testify to being directed by an engineer to exceed this specification. Finally, the tack truck distributor for the contractor testified that he had never heard a state engineer order or allow more tack application than called for in the day's operation.

current day's operation unless ordered or allowed by the Engineer." Because there was no engineer override ordering or allowing the tack application to exceed the amount estimated for the day's operation, Standard Specification 330.3(E) created a ministerial duty that did not implicate the sovereignty of the State.

[¶36.]     We have "held that highway repair is generally considered to be ministerial in nature[.]" *Id.* ¶ 23 (citing *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886). However, highway repair and maintenance functions will be considered discretionary, subject to sovereign immunity, when they involve actual planning and design, policy decisions, or actions that are not subject to an established standard. *See King*, 2007 S.D. 2, ¶ 21, 726 N.W.2d at 610 (The failure by DOT employees to place certain markings on a highway culvert that resulted in a fatal traffic accident "were not ministerial [acts] because at the time of the accident there was not a 'readily ascertainable standard.'"); *Hansen*, 1998 S.D. 109, ¶¶ 25–31, 584 N.W.2d at 887–88 (Claims brought against the DOT, the Secretary of the DOT and the Transportation Commission after a motorist entered a large hole in a highway due to construction were barred by sovereign immunity because the motorist failed to allege an "absolute, certain, and imperative duty" or a "readily ascertainable standard" creating a ministerial duty on any of the named defendants.); *Wilson v. Hogan*, 473 N.W.2d 492, 493 (S.D. 1991) (A claim for "an inadequately designed and maintained storm drainage system on [a highway]" involves an act that is a discretionary function.); *High-Grade Oil*, 295 N.W.2d at 739 (The design of a highway involves a discretionary function subject to sovereign immunity.).

[¶37.]	Standard Specification 330.3(E) established a mandatory specification that created a ministerial duty much like the DOT policy addressed in *Wulf*. In *Wulf*, this Court determined that DOT Policy 2531 created a ministerial duty in that it required the DOT to use sand/salt/chemical mixtures and continue operations from 5:00 a.m. until 7:00 p.m. during a winter storm, unless certain conditions existed. 2003 S.D. 105, ¶ 31, 669 N.W.2d at 146. The *Wulf* Court determined "[o]nce DOT made the decision to adopt policy 2531, [DOT employees] were obligated to follow it." *Id.* ¶ 32. "[O]nce it is determined that the act should be performed, subsequent duties may be considered ministerial." *Id.* (quoting *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886).

[¶38.]	In other contexts, this Court has recognized that established standards create ministerial duties that do not fall within the immunity afforded to the sovereign. In *National Bank of South Dakota v. Leir*, this Court held that the placement and supervision of children in a foster home by the Department of Social Services was a ministerial function. 325 N.W.2d at 849. In differentiating between a discretionary and ministerial function, this Court considered that the "care and placement of children is an important function and there is strong likelihood that serious harm will result to members of the public if it is performed incorrectly." *Id.* at 849–50. We further observed that the "criteria for placement and standards for follow-up of foster children are already established. Social workers are merely required to carry out or administer these previously established standards." *Id.* at 850. *Leir* recognized that while "some discretion in its literal sense is involved in

foster care, social workers do not make policy decisions involving foster care placement." *Id.*

[¶39.] In *State v. Ruth*, this Court recognized that while the requirement for a governmental officer to estimate the funds available for investment may involve the exercise of some judgment or discretion, the obligation to make this estimate was a mandatory, ministerial function. 9 S.D. 84, 68 N.W. at 190–91 (holding that the Commissioner of School and Public Lands could be held liable for the loss of investment income for negligently failing to *estimate* the funds available to be invested before the start of the fiscal year because "[i]n making the estimate, [the Commissioner] was . . . required to exercise judgment and discretion; but the law did not permit him to decide whether or not any estimate should be made within the time specified by the statute"). *Id.*

[¶40.] Similarly, Standard Specification 330.3(E) created a standard requiring that tack application ahead of the mat laydown "shall not exceed the amount estimated for the current day's operation." DOT employees were tasked with the ministerial responsibility to ensure that an estimate of the tack needed for the day was made and not exceeded.[8]

---

8. Disputed issues of fact exist whether daily estimates of the tack needed for the day were made or exceeded. Contractor employees testified that they always followed the State's directives for applying the amount of tack coat each day. However, Gates testified that he was never involved in this process. Royalty did not testify to making an estimate of the tack needed each day but explained that he and the contractor would get together and decide on the amount of tack to be laid. There was no evidence that an estimate was made for the amount of tack needed on June 29, or whether that estimate was exceeded, but the evidence shows that at the end of the day some 1,400 feet of exposed tack coat remained on the highway. Disputed

(continued . . .)

[¶41.]    The mandate in Standard Specification 330.3(E), requiring that the "[t]ack application ahead of mat laydown . . . *shall* not exceed the amount estimated for the current day's operation . . ." was "absolute, certain, and imperative." *Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 80. This specification established a governing standard with a compulsory result. The requirement to make an estimate and follow it did not "involve policy making or the exercise of professional expertise and judgment[.]" *King*, 2007 S.D. 2, ¶ 13, 726 N.W.2d at 608 (quoting *Hansen*, 1998 S.D. 109, ¶ 23, 584 N.W.2d at 886). *See also Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014) (explaining that "[t]he distinction between discretionary acts and mandatory acts is essentially the difference between making higher-level decisions and giving orders to effectuate those decisions, and simply following orders"). There was no judgment or uncertainty in the obligation to make this estimate each day and limit the amount of tack laid down accordingly.

[¶42.]    For these reasons, we affirm the circuit court's determination that Standard Specification 330.3(E) created a ministerial duty that did not shield Gates and Royalty from sovereign immunity. Because questions of fact remain whether they breached this duty, as well as causation, and the amount of McGee's damages, we remand McGee's claims for further proceedings.

---

(. . . continued)
      issues of facts exist whether this amount of exposed tack was consistent with requirements of Standard Specification 330.3(E). There was some testimony that it would not be unusual to have several hundred feet of exposed tack at the end of the day, but the operator of the tack truck testified that he had the ability to "stop within about 20 feet, less than that" when laying down the tack coat for the day.

**[¶43.]    DEVANEY, Justice, writing for the Court on Issue 3(b).**

### b.    *Whether the DOT had a ministerial duty with respect to the use of warning signs.*

[¶44.]    The DOT further asserts that the circuit court erred in concluding that Gates and Royalty had a ministerial duty to take precautionary measures when exposed tack is left on the highway.  The DOT notes that the court should not have relied on language in the Hot Mix Handbook—a handbook that is not part of the Standard Specifications, either explicitly or by reference.

[¶45.]    While, as a general matter, duties underlying negligence claims against a person engaged in a particular trade or profession might be defined by professional customs, practices, or guidelines, this Court's prior cases addressing whether the nature of a State employee's duties are ministerial have not relied upon handbooks of this nature to make such a determination.  Rather, the Court has looked to statutes or specific policies adopted pursuant to statute, and with respect to warning signs in particular, the Court has considered the directives in the MUTCD.  *See Wulf*, 2003 S.D. 105, ¶ 12, 669 N.W.2d at 139 (noting that it is the DOT policy established pursuant to SDCL 31-5-8.3 which establishes the State employees' responsibilities); *Truman*, 2009 S.D. 8, ¶¶ 25, 26, 762 N.W.2d at 81–82 (noting that in order to establish a ministerial duty under SDCL 31-28-6, "'standard uniform traffic control practices' must exist and delineate at which specific points signs must be erected at this type of intersection").  Notably, the explanation in *Truman* of what constitutes a ministerial duty refers to set tasks or defined duties *imposed by law*.  *Id.* ¶ 21, 762 N.W.2d at 80–81.

[¶46.]        Even if the Hot Mix Handbook is deemed a relevant source from which the nature of the duty here may be defined, the language of the handbook includes terms that are not definitive and do not, therefore, mandate a particular action. The handbook provides: "Tack coat *should* not be left exposed to traffic. *If doing so is necessary*, proper precautions, *such as* reducing the posted speed limit on the roadway and sanding the surface, should be taken." (Emphasis added.) Its further provisions also lack precision: "[T]he tack coat is *normally* placed only a *short* distance in front of the paver—within the lane closure and *far enough* ahead for the tack to set properly before the [mix] is laid on top of it. Traffic is kept off the tack coat at all times. . . . *Under unusual circumstances*, *if traffic must travel over the tack coat before the overlay is placed*, a light layer of sand *can* be spread on top of the tack coat to prevent its pickup by traffic." (Emphasis added.) Therefore, the Hot Mix Handbook does not create ministerial duties for which McGee could bring suit against Gates and Royalty.

[¶47.]        However, in regard to the DOT's duty to take precautionary measures, the circuit court also relied on the Standard Specifications and the MUTCD. Under Standard Specification 330.3(G):

> The Contractor shall provide flaggers, signs, and barriers to warn, direct, and prevent traffic from traveling on the *freshly applied asphalt until it has penetrated, and does not track or pickup on the tires* of traveling vehicles or the surface has been blotted with sand. Temporary traffic control shall conform to Section 634.

(Emphasis added.) Under Standard Specification 634.1, the contractor's "work consists of furnishing, installing, and maintaining required temporary traffic control devices in accordance with the current edition of the Federal Manual on

Uniform Traffic Control Devices (MUTCD)."[9]  The controlling edition of the MUTCD provides as "*Guidance*" that a "*FRESH OIL (TAR)*" sign "*should be used to warn road users of the surface treatment.*"

[¶48.]     The DOT disputes that this MUTCD provision is implicated when there is exposed, broken tack.  In its view, the language refers to one type of surface treatment—fresh oil—and "broken tack is by definition not *fresh*."  Notably, Standard Specification 330.3(G) mandates warning signs only with regard to "freshly applied asphalt until it has penetrated."  This supports the DOT's contention that the "Fresh Oil" sign does not appear to be mandated under the circumstances here.

[¶49.]     In response, McGee contends that the "Fresh Oil" sign was required during the entirety of the tack coat operations, and thus, Gates and Royalty "had no alternative but to act" and warn of the danger.[10]  He directs this Court to the language in the contract's Plan Documents (Plate No. 634.23) providing: "For tack and/or flush seal operations, when flaggers are not being used, the FRESH OIL sign (W21-2) *shall be displayed in advance of the liquid asphalt* areas."  (Emphasis added.)  But this provision, despite referring to tack operations generally, only directs the use of a "Fresh Oil" sign for "liquid asphalt" areas.  Regardless, as noted

9.     While the MUTCD is incorporated by reference in the Standard Specifications, SDCL 31-28-11 also requires that the markings and traffic signals on any street or road constructed with federal aid "conform to uniform national signing standards."

10.    McGee also contends that the DOT had a duty to ensure that the speed limit was lowered in the area of the accident.  However, McGee has not directed this Court to a Standard Specification or MUTCD provision mandating that the speed be lowered.

above, the Court in *Wulf* explained that it is the DOT policy adopted pursuant to statute that establishes the DOT employees' responsibilities, not the contract between the DOT and the contractor. 2003 S.D. 105, ¶ 12, 669 N.W.2d at 139–40.

[¶50.] Moreover, although the Standard Specifications and the MUTCD, adopted pursuant to statute, define the DOT's duties as it relates to the resurfacing project, the language of the MUTCD provision on which McGee relies does not support that Gates and Royalty had a ministerial duty to ensure that a "Fresh Oil" sign was placed on all roadways containing exposed, broken tack. This MUTCD provision is written as a "*Guidance.*" Importantly, the definitional section of the MUTCD states:

> Guidance—a statement of recommended, *but not mandatory*, practice in typical situations, with deviations allowed if engineering judgment or engineering study indicates the deviation to be appropriate. All Guidance statements are labeled, and the text appears in unbold type. The verb "should" is typically used. The verbs "shall" and "may" are not used in Guidance statements. Guidance statements are sometimes modified by Options.

*Manual on Traffic Control Devices for Streets and Highways*, § 1A.13 Definitions of Headings, Words, and Phrases in this Manual (2009 ed. with 2012 revisions) *available at* https://mutcd.fhwa.dot.gov/pdfs/2009r1r2/mutcd2009r1r2edition.pdf (emphasis added). The MUTCD provision at issue uses terms such as "should" rather than "shall" and is therefore, by definition, not a mandatory directive.

[¶51.] In *Hansen*, this Court noted that when a traffic control device is mandated by the MUTCD, the use of the device is not discretionary. 1998 S.D. 109, ¶ 31, 584 N.W.2d at 888. However, when the language of the MUTCD provision "accommodates an exercise of discretion," "failing to erect signs is generally not

actionable." *Bickner*, 2008 S.D. 27, ¶ 15, 747 N.W.2d at 672. The failure to erect the "Fresh Oil" sign would also not be actionable under SDCL 31-28-6, which provides that "[t]he public board or officer whose duty it is to repair or maintain any public highway shall erect and maintain at points in conformity with standard uniform traffic control practices on . . . [a] *point of danger* on such highway, . . . a substantial and conspicuous warning sign." (Emphasis added.) This Court has explained that a ministerial duty under this statute requires "a specific governing provision from MUTCD in support of the specific duty[,]" and, here, the MUTCD provision does not *mandate* that the "Fresh Oil" sign be erected when there exists exposed, broken tack. *See Hansen*, 1998 S.D. 109, ¶ 31, 584 N.W.2d at 888; *see also Truman*, 2009 S.D. 8, ¶ 25, 762 N.W.2d at 81–82 (noting that "in order to establish a ministerial duty under this statute, 'standard uniform traffic control practices' must exist and delineate at which specific points signs must be erected").

[¶52.] Because McGee has not identified ministerial duties relating to the use of precautionary measure, the circuit court erred when it denied the DOT, Gates, and Royalty summary judgment against McGee's claims in this regard.

[¶53.] Affirmed in part, reversed in part, and remanded.

[¶54.] JENSEN, Chief Justice, and KERN and MYREN, Justices, concur.

[¶55.] SALTER, Justice, concurs in part and dissents in part.

[¶56.] DEVANEY, Justice, dissents in part.

DEVANEY, Justice (dissenting in part).

[¶57.]        Applying our well-settled law governing whether an act is discretionary or ministerial, it is apparent that compliance with Standard Specification 330.3(E) involves the exercise of judgment or discretion and is thus not ministerial. In concluding otherwise, the majority writing on Issue 3(a) determines that Standard Specification 330.3(E) tasked DOT employees "with the ministerial responsibility to ensure that an estimate of the tack needed for the day was made and not exceeded" and that "[t]here was no judgment or uncertainty in the obligation to make this estimate each day and limit the amount of tack laid down accordingly." But by its plain terms, Standard Specification 330.3(E) allows for discretion in determining how much tack can be and is laid on a given day. Therefore, it does not, contrary to McGee's suggestion, create a ministerial duty to make sure tack is never left exposed. I therefore respectfully dissent on Issue 3(a).

[¶58.]        Standard Specification 330.3(E) provides that "[t]ack application ahead of mat laydown shall be limited by job conditions and shall not exceed the amount *estimated* for the current day's operation *unless ordered or allowed* by the Engineer. Tacked areas, which become unsatisfactory as a result of traffic, weather, or other conditions, shall be retacked. Required retacking which is not the fault of the Contractor will be paid for at the contract price for tack asphalt." (Emphasis added.) While this Specification states a clear directive that the amount of tack laid each day shall not exceed the amount *estimated* for that day's operation, estimation by its nature involves the exercise of discretion. According to testimony from both the contractor and DOT employees, there are numerous factors that vary day to day

affecting whether applying the amount of tack estimated for a day's operation will nevertheless result in tack being left exposed at the end of each day. Notably, this Specification itself does not direct that an estimate be made, and to the extent it implies that such is required, it does not state a mandatory directive that the DOT ensure that the amount of tack applied is actually covered with a topcoat at the end of each day. Rather, this Specification affords the DOT engineer discretion to allow the amount laid to exceed the amount estimated. Also, by requiring the roadway to be retacked if tacked areas "become unsatisfactory *as a result of traffic*[,]" it contemplates that tack may be exposed to vehicular travel. (Emphasis added.)

[¶59.] Although the majority seems to acknowledge that compliance with Standard Specification 330.3(E) (e.g., estimating the amount of tack to be laid and allowing the application of more than estimated) involves the exercise of discretion, it nevertheless concludes that "[b]ecause there was no engineer override ordering or allowing the tack application to exceed the amount estimated for the day's operation, Standard Specification 330.3(E) created a ministerial duty that did not implicate the sovereignty of the State." There are two problems with this reasoning.

[¶60.] First, whether an engineer ordered or allowed the tack application to exceed the amount estimated for the day's operation goes more toward the question of breach and not to whether the duty set forth in Standard Specification 330.3(E) is discretionary or ministerial. Second, even if these types of facts were material to the duty question here, a review of the record reveals that a determination *as a matter of law* that a ministerial duty exists would be inappropriate because the

material facts are in dispute. For example, while Gates testified that he personally did not pay attention to the amount of tack that was left exposed each day, he explained that he was not on site at the project daily. However, Royalty, who was on site at the project, testified that he and the contractor decided based on the variables at issue that day and throughout the day how much tack would be laid. Finally, while neither Gates nor Royalty testified that they ordered or allowed excess tack to be applied, they both testified that it was common for there to be exposed tack at the end of the day, suggesting that such was allowed.

[¶61.] I further disagree with the majority's view that the directives in Standard Specification 330.3(E) are similar to those at issue in *Wulf* and *Ruth*. In *Wulf*, the DOT policy contained a mandatory directive "to use specified sand/salt/chemical mixtures and to continue sanding operations from 5:00 a.m. (in the morning) until 7:00 p.m. (in the evening) unless 1) the traffic is moving safely or 2) conditions become too hazardous for continued operations." 2003 S.D. 105, ¶ 31, 669 N.W.2d at 146. Here, in contrast, there is no such "if-then" directive.[11] Rather, Standard Specification 330.3(E) gives the DOT discretion in determining the amount of tack to apply each day and whether to allow the amount laid to exceed the day's estimation.

[¶62.] Also, although the Court in *Ruth* concluded that the government official's duty to make an estimate was ministerial, the Court reached this

---

11.     McGee argues otherwise, claiming that if "some unforeseen event occurred . . . safety measures were required including the mandatory posting of MUTCD W21-2 'Fresh Oil' signs and lowering the speed limit." However, based on this Court's ruling under Issue 3(b), the DOT did not have a ministerial duty to employ such precautionary measures.

conclusion based on the fact that "[i]n failing to act at all, [the government official] disregarded a plain provision of the law, and failed to perform a merely ministerial duty." 9 S.D. 84, 68 N.W. at 191. This is starkly different than the circumstances here, which, as the majority writing notes, reveal disputed issues of fact on the question whether the DOT estimated the amount of tack to be applied for the day's operation.

[¶63.]        Even so, because of the discretionary nature of the language in Standard Specification 330.3(E), this Specification does not set forth a specific duty "arising from fixed designated facts or the execution of a set task imposed by law prescribing and defining the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion[.]" *See Truman*, 2009 S.D. 8, ¶ 21, 762 N.W.2d at 80–81. It likewise does not envision "direct adherence to a governing rule or standard with a compulsory result." *Id.* I would therefore conclude that sovereign immunity bars McGee's claims against the DOT, Gates, and Royalty.

[¶64.]        SALTER, Justice, joins this writing.